IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| MARK R. KIESEL LIVING TRUST and MONTANA WOODS LLC, | CV 22-109-M-KLD |
| Plaintiffs, | |
| vs. | ORDER |
| THOMAS HYDE, | |
| Defendant. | |

Following a discovery status conference on February 14, 2023, the Court issued an order directing the parties to brief the issue of agency between the Plaintiffs, Mark R. Kiesel Living Trust and Montana Woods LLC (collectively "Kiesel"), and Justin Alexander, an architect retained by Kiesel. (Doc. 29). In particular, the Court directed the parties to address whether an agency relationship exists, and if so, the scope of that agency relationship and the effect of that agency relationship on claims of attorney-client privilege and work product doctrine. The Court also ordered Kiesel to submit, in camera, the documents noted in his privilege log for in camera review so the Court can determine whether the withheld documents are protected by attorney-client privilege and/or the work product doctrine.

The parties completed the Court-ordered briefing on March 14, 2023 (Docs.

34 and 36), and Kiesel has submitted the documents identified in his privilege log for in camera review (Doc. 33). Having considered the parties' arguments, and having conducted in camera review of the documents provided by Kiesel, the Court issues the following order.

## I.   **Background**[1]

In June 2021, Kiesel closed on the purchase of an undeveloped residential lot ("the Property") from Defendant Thomas Hyde. (Doc. 27 at ¶¶ 6-11). The Property is located within the Stock Farm Club Development ("Stock Farm") in Hamilton, Montana. (Doc. 27 at ¶¶ 6, 18). Kiesel retained Alexander, a principal at A&E Architects, to design a home on the Property. (Doc. 27 at ¶¶ 15-21). Kiesel asserts that while Alexander was carrying out his professional design work in mid-August 2021, he discovered a vertical PVC pipe on the Property. (Doc. 27 at ¶ 16). Alexander contacted a civil engineer to investigate the purpose of the pipe and ascertain whether any utilities or utility easements existed on the Property. (Doc. 27 at ¶ 17). In late August 2021, the civil engineer advised Alexander that the pipe was an element of the Stock Farm community sewer that was located on the Property. (Doc. 27 at ¶ 18). Several days later, Alexander contacted the Stock Farm Homeowners Association Manager, Bill Thomas, and requested additional

---

[1] These alleged facts are taken from the Amended Complaint for the purpose of providing background information.

information about the pipe. (Doc. 27 at ¶ 19). Thomas advised Alexander that PCI Engineering would investigate the issue, and in mid-October 2021, Thomas advised Alexander that PCI Engineering had discovered the existence of sewage, gas, and electrical utility lines running directly through the center of the Property. (Doc. 27 at ¶¶ 20-21).

Kiesel alleges that Hyde failed to disclose the presence of any utilities or utility easements prior to the sale of the Property, and commenced this action against him in June 2022. (Doc. 27). Kiesel asserts claims for negligence, rescission, negligent misrepresentation, fraud, constructive fraud, punitive damages, and breach of contract. (Doc. 27 at ¶¶ 30- 89).

On November 18, 2022, Hyde served Kiesel with a set of discovery requests that included requests for all communications between Kiesel and his architect, Alexander. (Doc. 24 at 2). Kiesel has objected to the discovery requests, and has withheld certain communications with Alexander on the basis that the communications are protected by the attorney-client privilege and/or work-product doctrine. (Doc. 24 at 2).

Kiesel has filed all withheld or redacted documents under seal for in camera review by the Court, and has included a First Amended Privilege Log ("Privilege Log") identifying the documents at issue. (Doc. 34-1). Hyde takes the position that Kiesel's communications with Alexander are not protected, and asks the Court to

order Kiesel to produce all documents identified in the Privilege Log. (Doc. 34-1).

## II.   Discussion

Kiesel maintains the withheld communications are protected by the attorney-client privilege and/or work product doctrine because Alexander was at all times acting as his agent in relation to the investigation, design, and eventual construction of a residential home on the Property. Because of this agency relationship, Kiesel argues, Alexander's participation in otherwise confidential conversations does not render them unprivileged, and he is capable of generating documents protected by the work-product doctrine. (Doc. 34 at 8).

Hyde disagrees, and contends that even if Alexander was acting as Kiesel's agent, Kiesel has not met his burden of demonstrating that the requirements for protection under the attorney-client privilege or work product doctrine are satisfied. Hyde further argues that Kiesel has waived the protections provided under the attorney-client privilege and work product doctrine by retaining a critical fact witness as a consultant for purposes of this litigation. (Doc. 36 at 8).

### A.    Existence and Scope of Agency Relationship

Under Montana law, "[a]n agent is one who represents another, called the principal, in dealings with third persons."[2] Mont. Code Ann. § 28-10-101. "Agency

---

[2] Because subject matter jurisdiction is based on diversity of citizenship, the Court applies the substantive agency law of Montana, the forum state. See *Medical Laboratory Mgmt. Consultants v. American Broadcasting Companies, Inc.*, 306

is 'the fiduciary relation which results from the manifestation of consent by one person to another' that the agent shall act on behalf of the principal subject to the principal's control and consent." *Associated Mgmt. Servs., Inc. v. Ruff*, 424 P.3d 571, 586 (Mont. 2018) (quoting *Butler Mfg. Co. v. J&L Implement Co.*, 540 P.2d 962, 965 (Mont. 1975)).

An agency relationship "is either actual or ostensible." Mont. Code Ann. § 28-10-103(1). An agency is actual "when the agent is 'really employed' by the principal, and is ostensible when the principal 'intentionally or by want of ordinary care causes a third person to believe another to be the principal's agent when that person is not really employed by the principal.'" *Dick Anderson Construction, Inc. v. Monroe Property Co., LLC*, 255 P.3d 1257, 1261 (Mont. 2011) (quoting Mont. Code Ann. § 28-10-103(1)).

A principal may create an agency relationship and confer agency authority by a prior authorization or a subsequent ratification. Mont. Code Ann. § 28-10-201. "An actual or ostensible agent has implied authority to 'do everything necessary, proper, and usual in the ordinary course' of the principal's business 'for effecting the purpose of the agency.'" *Ruff*, 424 P.3d at 587 (quoting Mont. Code Ann. § 28-10-405(1)). "A principal may confer actual or ostensible authority upon an agent by express authorization or circumstantial implication." *Ruff*, 424 P.3d at

---

F.3d 806, 812 (9th Cir. 2002).

587.

Kiesel argues the facts and circumstances establish that he had both an actual and ostensible agency relationship with Alexander. To satisfy his evidentiary burden of establishing an agency relationship, Kiesel has submitted his own declaration and an affidavit from Alexander. (Docs. 34-3 and 34-4). As described in these supporting materials, Kiesel retained Alexander to assist in the investigation, design, and eventual construction of a residential home on the Property. (Doc. 34-3 at ¶¶ 6-7; Doc. 34-4 at ¶¶ 4-6). Kiesel explains that "[t]his eventually included the development of solutions related to the existence of undisclosed utility lines (including sewer, gas, and electric) on the Property." (Doc. 34-3 at ¶ 7). Kiesel states that he entrusted Alexander to act on his behalf in furtherance of these efforts, including by establishing dealings with engineers, members of the Stock Farm Homeowners Association ("the Association"), and officials at Ravalli Electric and Northwestern Energy. (Doc. 34-3 at ¶ 10). And when it became apparent that he needed legal advice regarding the Property, Kiesel explains, Alexander was instrumental in helping him find an attorney. (Doc. 34-3 at ¶¶ 21-22). Kiesel further states that because Alexander had been acting on his "behalf in relation to issues related to the Property, [Alexander] was the best historian when it came time to communicate the situation to an attorney," and that he relied on Alexander "to facilitate the obtainment of legal advice from" his

6

attorneys. (Doc. 34-3 at ¶¶ 23-24).

Alexander's affidavit corroborates much of the information provided in Kiesel's declaration. (Doc. 34-4). Alexander states that he took numerous actions on Kiesel's "behalf, and established dealings with third parties, in relation to assessing the feasibility of designing and constructing a residential home on the Property." (Doc. 34-4 at ¶ 6). Alexander explains that "[o]nce the existence of utility lines on the Property became known," he took actions on Kiesel's "behalf to develop solutions to facilitate construction of a residential home on the Property," including by establishing dealings with members of the Association and individuals at Ravalli Electric and Northwestern Energy. (Doc. 34-4 at ¶¶ 8-11). Alexander confirms that he assisted Kiesel "in procuring and retaining an attorney," and participated in several conversations with Kiesel and/or his attorneys. (Doc. 34-4 at ¶¶ 16-17).

Kiesel argues the facts described above are sufficient to establish that Alexander was his actual or ostensible agent, and describes the scope of their agency relationship as follows: "Mr. Alexander was retained to assist in the investigation, design, and eventual construction of a residential home on the Property. That was the purpose of the agency relationship." (Doc. 34 at 19). Kiesel asserts that as the situation evolved, however, Alexander's "focus eventually shifted from designing a home, to exploring available options to address the newly

7

discovered sewer and utility lines on the Property." (Doc. 34 at 20). Kiesel further argues that as part of the agency relationship, Alexander was authorized to establish dealings with third parties on his behalf, including attorneys. (Doc. 34 at 21). Kiesel thus takes the position that Alexander was also acting within the scope of his agency authority when he helped Kiesel find legal counsel and communicated with Kiesel's attorneys. (Doc. 34 at 21).

Hyde does not dispute that Alexander was Kiesel's agent for the purpose of assisting with the investigation, design, and eventual construction of a residence on the Property. (Doc. 36 at 9). As Hyde rightly notes, this would include exploring available options to address the newly discovered sewer and utility lines on the Property. (Doc. 36 at 10 n. 1). Hyde does, however, take issue with Kiesel's apparent assertion that he later expanded the scope of Alexander's agency authority to assist with this litigation. Hyde points out that Kiesel has recognized Alexander's importance as a fact witness from the outset of this litigation, as evidenced by the fact that he identified Alexander as the first non-party witness in his preliminary pretrial statement. (Doc. 17 at 12-13). Hyde argues Kiesel should not be allowed to claim an expanded scope of the agency relationship with Alexander because it now benefits him to do so, and asks the Court to disregard the self-serving statements in the affidavits provided by Kiesel and Alexander.

To the extent Kiesel now claims to have expanded the scope of Alexander's

agency authority to assist with this ligation, and states that he relied on Alexander to "facilitate the obtainment of legal advice" from his attorneys, the Court gives his carefully crafted affidavit little weight. But even assuming the scope of the agency relationship is as broad as Kiesel now suggests, Hyde argues, this does not necessarily mean that all communications exchanged within that relationship are protected under the attorney-client privilege and work product doctrine. Kiesel views the effect of such an agency relationship differently, and maintains the communications at issue are protected by the attorney-client privilege and/or work product doctrine.

### B.   Effect of Agency Relationship on Plaintiffs' Assertion of Attorney-Client Privilege and Work Product Protection

#### 1.   Attorney-Client Privilege

In a diversity case like this one, the Court applies the privilege law of the forum state. *Theme Promotions, Inc. v. News Am. Marketing FSI*, 546 F.3d 991, 1007 (9th Cir. 2008); *Nei v. Travelers Home and Marine Ins. Co.*, 326 F.R.D. 652, 657 (D. Mont. 2018). Because it does not appear that the Montana Supreme Court has addressed application of the attorney-client privilege to communications involving an agent of the client, however, the Court may look to authority from the Ninth Circuit and other jurisdictions for guidance. See e.g. *Sweeney v. Dayton*, 416 P.3d 187, 190 (Mont. 2018).

The attorney-client privilege protects "communications made by the client to

the client's attorney or the advice given to the client by the attorney" during the

course of the professional relationship. Mont. Code Ann. § 26-1-803. See also

*American Zurich Ins. Co. v. Montana Thirteenth Judicial District Ct.* 280 P.3d

240, 245 (Mont. 2012). Because it "obstructs the truth-finding process," the

attorney-client privilege is narrowly construed and "protects only those disclosures

– necessary to obtain informed legal advice – which might not have been made

absent the privilege." *American Zurich*, 280 P.3d at 245 (quoting *Fisher v. U.S.*,

425 U.S. 391, 403 (1976)).

The Montana Supreme Court has adopted the eight essential elements

governing application the attorney-client privilege as outlined by the Ninth Circuit:

> (1) Where legal advice of any kind is sought (2) from a professional legal
> adviser in his capacity as such, (3) the communications relating to that
> purpose, (4) made in confidence (5) by the client, (6) are at his instance
> permanently protected (7) from disclosure by himself or by the legal adviser,
> (8) unless the protection be waived.

*In re Grand Jury Investigations*, 974 F.2d 1068, 1071 n.2 (9th Cir. 1992). See *State*

*ex rel. U.S. Fidelity & Guar. Co. v. Montana 2d Jud. Dist. Ct.,* 783 P.2d 911, 914-

15 (Mont. 1989) (adopting the Ninth Circuit standard). "The party asserting the

attorney-client privilege has the burden of establishing the relationship and

privileged nature of the communication." *United States v. Richey*, 632 F.3d 559,

566 (9th Cir. 2011). See also *Sweeney,* 416 P.3d at 190.

While the privilege generally "extends only to communications between an

attorney and a client," there are certain exceptions "which permit communications involving third parties to receive the same protection." *American Zurich*, 280 P.3d at 245. In *American Zurich*, for example, the Montana Supreme Court adopted the common interest doctrine and held that attorney-client communications may be protected if disclosed to a third party, where the parties are engaged in "a joint effort with respect to a common legal interest." *American Zurich*, 280 P.3d at 245. "Such disclosures may be privileged if communicating with the third party is '*necessary* for the client to obtain informed legal advice,'" as might be the case when communicating with co-litigants "or other professionals assisting the attorney in representing the client." *American Zurich*, 280 P.3d at 245 (citations omitted). The Ninth Circuit follows the same rule. *Richey*, 632 F.3d at 566 (holding that "[t]he attorney-client privilege may extend to communications with third parties who have been engaged to assist the attorney in providing legal advice").

In addition, the Ninth Circuit has held that the attorney-client privilege may extend to "communications with third parties 'acting as agent' of the client." *United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020). See also *United States v. Landof*, 591 F.2d 36, 39 (9th Cir. 1978) (explaining that the mere presence of a third-party who is acting as an agent of the client does not necessarily destroy the attorney-client privilege). Kiesel relies on *Sanmina* and *Landof* to

11

support his argument that the withheld communications to which Alexander was a party are protected by the attorney-client privilege.

In *Sanmina*, the Ninth Circuit held a client waived the attorney-client privilege by disclosing attorney memoranda to a third party engaged by the client for the purpose of obtaining an opinion on stock value, rather than for the purpose of obtaining legal advice. *Sanmina*, 968 F.3d at 1117. While *Sanmina* recognized that, in some situations, the attorney-client privilege may extend to communications with third parties acting as an agent of the client, the Ninth Circuit made clear that the communications must be for the purpose of obtaining legal advice for privilege to apply. *Sanmina*, 968 F.3d at 1116 ("If the advice sought is not legal advice, but, for example accounting advice from an accountant, then the privilege does not exist."). If the client retains the third party agent or consultant "for non-legal purposes, the privilege is lost." *In re CV Therapeutics, Inc. Securities Litigation*, 2006 WL 1699536, at *7 (N.D. Cal. June 16, 2006).

The same holds true for communications with third parties acting as an agent of the attorney. See *United States v. Gurtner*, 474 F.2d 297, 298-99 (9th Cir. 1973); *United States v. Edison*, 2008 WL 170660, at *4 (N.D. Cal. 2008). For the attorney-client privilege to extend to a client's communications with an agent of the attorney, the communications must have been "made in confidence for the purpose of obtaining legal advice from the lawyer." *Gurtner*, 474 F.3d at 298. See

12

also *Edison*, 2008 WL 170660, at *4 (explaining that the attorney-client privilege only extends to communications with an agent of the attorney "where the purpose of the communication is to obtain legal advice from the attorney"); *Segerstrom v. United States*, 2001 WL 283805, at *3 (N.D. Cal. Feb. 6, 2001) ("The attorney-client privilege covers communications between the attorney, the client, or their agents, so long as the communications were intended to be confidential and made in rendering legal advice.").

As these cases instruct, the party invoking the attorney-client privilege bears the burden of establishing that communications with a third party acting as an agent of the attorney or client were made for the purpose of obtaining legal advice. In addition, the party invoking the privilege has the burden of demonstrating that the third-party communications were "necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit." *United States v. Kovel*, 296 F.2d 918, 922 (2nd Cir. 1961).

In *Kovel*, which has often been cited in the Ninth Circuit as a leading case on application of the attorney-client privilege to communications with third parties,[3] the Second Circuit held that the privilege extended to confidential communications made by a client to an accountant retained by the attorney. *Kovel*, 296 F.2d at 922. *Kovel* analogized the role of the accountant to that of an interpreter, reasoning that

---

3 See e.g. *In re CV Therapeutics*, 2006 WL 1699536, at *6.

"the presence of an accountant, whether hired by the lawyer or by the client, while the client is relating a complicated tax story to the lawyer, ought not destroy the privilege, any more than would that of a linguist." *Kovel*, 206 F.2d at 922. The presence of an accountant in such situations "is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit." *Kovel*, 206 F.2d at 922. *Kovel* emphasized: "What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer. If what is sought is not legal advice but only accounting aservice, . . . or if the advice sought is the accountant's rather than the lawyer's, no privilege exists." *Kovel*, 206 F.2d at 922.

The "necessity element" established in *Kovel* "means more than just useful and convenient." *Cavallaro v. United States*, 284 F.3d 236, 249 (1st Cir. 2002). Under *Kovel*, "[t]he privilege does not apply if the attorney's ability to represent the client is merely improved; instead, 'the involvement of the third party must be nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications.'" *ChromaDex, Inc. v. Elysium Health, Inc.*, 2019 WL 8227385, at *3 (C.D. Cal. Dec. 20, 2019) (quoting *Cavallaro*, 284 F.3d at 249)). See also *Cohen v. Trump*, 2015 WL 3617124, at *14 (S.D. Cal. June 9, 2015) (citing *Cavallaro* and *Kovel* for the same proposition); *Woodall v. Walt Disney Co.*, 2022 WL 16888542, at *2 (C.D. Cal. Sept. 29, 2022) (citing the same line of

14

cases for the proposition that "[t]he voluntary disclosure of an attorney-client privileged communication to a third party waives the privilege unless the disclosure is 'indispensable' to the communication").

Kiesel also relies on *Moe v. System Transport, Inc.*, 270 F.R.D. 613 (D. Mont. 2010) for the proposition that the attorney-client privilege extends to communications between a client's attorney and the client's agent, including those at issue here. (Doc. 34 at 23). In *Moe,* the court held that the privilege extended to communications between the defendant's attorneys and "an employee or agent" of "an independent claims adjuster or agent acting on behalf of, and at the direction of" the defendant. Moe, 270 F.R.D. at 623 n. 3. The Court reasoned that "[t]he extension of the privilege is based on the notion that sound legal advice depends upon the attorney being fully informed, and the necessary information may appropriately come from an agent of the client." *Moe*, 270 F.R.D. at 623 n. 3. *Moe* specifically noted that the communications identified in the defendant's privilege log were "made for the purpose of providing relevant information to obtain legal advice which, in turn, was for the purpose of handling and adjusting [the plaintiff's] claim." *Moe*, 270 F.R.D. at 623 n.3. *Moe* is thus consistent with *Kovel* and other cases holding that the party asserting the privilege as to communications involving an agent of the client has the burden of demonstrating both that the communications were made for the purpose of obtaining legal advice, and that the

15

communications were necessary for effective legal consultation.

Kiesel provides no persuasive reason for rejecting the "necessity element" established in *Kovel* and applied by district courts in the Ninth Circuit. Additionally, the Court notes that the Montana Supreme Court has imposed a similar requirement in the analogous context of the common interest doctrine. *American Zurich*, 280 P.3d at 245 (holding that where the parties are engaged in a joint effort with respect to a common legal interest, disclosures to a third party "may be privileged if communicating with the third party is '*necessary* for the client to obtain informed legal advice'") (italics in original and citations omitted).

Accordingly, as the party asserting the attorney-client privilege, Kiesel must show that (1) the communications involving Alexander were made for the purpose of obtaining legal advice from Kiesel's counsel and (2) Alexander's involvement was nearly indispensable or served some specialized purpose in facilitating the attorney-client communications.

Kiesel's Privilege Log asserts the attorney-client privilege as a basis for withholding several email exchanges involving (1) Kiesel, Alexander, and Kiesel's attorney; and (3) Alexander and Kiesel's attorney.[4] (Doc. 34-1). Having conducted

---

[4] Erika Hayflick, who is a manager of Plaintiff Montana Woods, and staff members employed by Kiesel's counsel also participated in some of these conversations. As Hyde apparently agrees, participation by these individuals did not waive the attorney-client privilege. See *Upjohn Co. v. United States*, 449 U.S. 383, 391 (1981).

its camera review of these materials, the Court finds that Kiesel has not met his burden, with some exceptions, of showing that the withheld communications are protected.

As discussed above, Kiesel retained Alexander to assist in the investigation, design, and eventual construction of a residential home on the Property. Generally speaking, the withheld communications include factual information regarding the discovery and location of the utility lines on the Property, and address possible solutions. The Court nevertheless assumes for present purposes that the communications at issue were made for the purpose of obtaining legal advice.

But even assuming the withheld communications were made for the purpose of obtaining legal advice, the Court finds that Kiesel has not demonstrated that Alexander's presence was reasonably necessary for effective consultation between the Kiesel and his attorney. To the extent Kiesel asserts that Alexander's involvement in the withheld communications was necessary because "he is the 'best historian' regarding the facts giving rise to this lawsuit" (Doc. 34 at 25), the Court is not persuaded.

Having performed an in camera review of the documents identified as attorney-client privileged in the Privilege Log, the Court finds Kiesel has not shown that Alexander's architectural expertise was necessary or highly useful for effective consultation between Kiesel and his attorney. Nor has Kiesel

demonstrated that Alexander's participation served some specialized purpose in facilitating Kiesel's communications with his attorney. That Alexander is familiar with the underlying facts may make him an important fact witness, but his familiarity with those facts does not mean that he was nearly indispensable or served some specialized purpose in facilitating Kiesel's communications with counsel. To the contrary, the withheld documents establish that Alexander facilitated communication, and provided his opinions, but nothing indispensable. While Alexander's participation was certainly convenient for Kiesel and his attorneys, it was not necessary or indispensable.

Kiesel's position that the withheld communications are privileged because Alexander is the "best historian regarding the facts" giving rise to this litigation is problematic for an additional reason. As argued by Hyde, Kiesel should not be allowed to retain a critical fact witness as a consultant and then obstruct Hyde's access to the facts known to the witness by invoking the attorney-client privilege. Two cases cited by Hyde provide some helpful guidance. See *Manufacturing Automation & Software Systems, Inc. v. Hughes*, 2017 WL 11630961 (C.D. Cal. Dec. 1, 2017); *Kelley v. Microsoft*, 2009 WL 168258 (W.D. Wash. Jan. 23 2009).

In *Manufacturing Automation*, the plaintiff ostensibly engaged a third-party as a software consultant, and also listed the third-party as a fact witness in its initial disclosures. *Manufacturing Automation*, 2017 WL 11630961 at **1, 7. The

plaintiff asserted attorney-client protection as to the third-party's communications with plaintiff's counsel. *Manufacturing Automation*, 2017 WL 11630961 at *5. The court recognized that "[t]he attorney-client privilege may extend to communications with third parties who have been engaged to assist the attorney in providing legal advice," but noted the plaintiff had listed the third party as a fact witness in its initial disclosures and found the plaintiff could not "avoid disclosure of relevant factual information by conveniently labeling [the third party's] role" as that of an investigator, software consultant, or non-testifying expert. *Manufacturing Automation*, 2017 WL 11630961 at *7.

In *Kelley*, the defendant retained a consulting firm "to provide 'litigation advisory services' including 'litigation consulting' and 'discovery assistance.'" *Kelley*, 2009 WL 168258, at *1. During a Rule 30(b)(6) deposition, an employee of the consulting firm refused to produce documents relating to her communications with the defendant's counsel, and the defendant listed several documents not produced in relation to the deposition in its privilege log. *Kelley*, 2009 WL 168258, at *1. The defendant asserted the communications were protected by the attorney-client privilege because the consulting firm acted as an agent "of counsel for the purpose of translating the client's data." *Kelley*, 2009 WL 168258, at *1. The court rejected the defendant's position, reasoning that "[o]nce a third party witness, hired after the start of litigation, is offered as deponent on the client's behalf, it becomes

difficult for that third party to maintain that its primary function [is] to provide legal advice." *Kelley*, 2009 WL 168258, at *2. The court agreed with the plaintiff "that it would be problematic to allow counsel to hire a fact witness and then instruct that witness under the cloak of privilege." *Kelley*, 2009 WL 168258, at *2.

Hyde argues that the facts here are even more compelling than those in *Kelley,* where the third-party had specifically been retained as a litigation consultant. As stated in Kiesel's supporting declaration, he retained Alexander to assist in the investigation, design, and eventual construction of a residential home on the Property. (Doc. 34-3 at ¶¶ 6-7; Doc. 34-4 at ¶¶ 4-6). While performing that role, Alexander acquired information that makes him a critical fact witness to the circumstances giving rise to this litigation. Kiesel has known since from the outset of this litigation that Alexander would be a critical fact witness, as evidenced by the allegations in the Complaint (Doc. 27 at ¶¶ 15-21) and the fact that Kiesel identified Alexander in his preliminary pretrial statement as an individual having "knowledge and information related to discovery of the utilities on the Property and their effect on the ability to construct a residence on the Property." (Doc. 17 at 12-13). As in *Kelley*, Kiesel cannot obstruct Hyde's access to the facts by "hir[ing] a fact witness and then instruct[ing] that witness under the cloak of coverage." *Kelley*, 2009 WL 168258, at *2. Kiesel cannot have it both ways and rely on Alexander as a fact witness to support his claims while also asserting the attorney-

client privilege as to any communications involving Alexander and Kiesel's attorneys.

For all of the reasons discussed above, and having conducted an in camera review, the Court finds that Kiesel has not met his burden of demonstrating that most of the communications identified in the Privilege Log (Doc. 34-1) are protected by the attorney-client privilege. There are, however, documents that do qualify as attorney-client privileged documents, as they are solely between Kiesel, Erika Hayflick, and Kiesel's attorneys or their staff. Notably, the bottom portion of Kiesel 1206 through the middle of Kiesel 1207 are attorney-privileged documents.[5]

2.   Work Product Doctrine

Unlike the attorney-client privilege, "application of the work-product doctrine in diversity of citizenship cases is determined under federal law." *Kandel v. Brother Int'l Corp.*, 683 F.Supp.2d 1076, 1083 (C.D. Cal. 2009). The work product doctrine is set forth in Federal Rule of Civil Procedure 26(b)(3), which provides that "[o]rdinarily a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or

---

[5] Neither party addresses Kiesel 1034-1039, which were redacted as both attorney-client privileged and work product documents, but are primarily emails between Kiesel's attorneys and employees of First American Title, who, as far as the Court understands, are neither parties to the case nor argued to be agents for Kiesel. The Court does not believe they are appropriately redacted as attorney-client privileged documents.

its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3).

In addition to protecting documents created by an attorney, the work product doctrine may protect documents created by an agent or client of an attorney. *Colonies Partners, L.P. v. County of San Bernardino*, 2020 WL 5846477, at *3 (C.D. Cal. Jan. 24, 2020) (citing *In re Grand Jury Supboena (Mark Torf/Torf Environmental Management)*, 357 F.3d 900, 907 (9th Cir. 2004) (finding documents created by an investigator at the direction of counsel were protected work product); *McEwen v. Digitran Systems, Inc.*, 155 F.R.D. 678, 683 (D. Utah 1994) ("The work product doctrine protects material prepared by agents for the attorneys as well as those prepared by the attorney for himself."); *Gucci Am., Inc. v. Guess, Inc.*, 271 F.R.D. 58, 74 (S.D.N.Y. 2010) (recognizing that the work product doctrine has been "extended… to work product produced by a client at the direction of counsel in anticipation of litigation")). The work product doctrine is thus "broader than the attorney-client privilege as it includes documents that are not confidential communications and documents prepared by non-attorneys at the direction of attorneys." *Kelly v. Provident Life and Accident Ins. Co.*, 2009 WL 10664172, at *5 (S.D. Cal. May 29, 2009).

The Supreme Court has explained the rationale for extending work-product to non-attorneys as follows:

> At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case. But the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorneys as well as those prepared by the attorney himself.

*United States v. Nobles*, 422 U.S. 225, 238-39 (1975). "The primary purpose of the work product doctrine is to 'prevent exploitation of a party's efforts in preparing for litigation.'" *Holmgren v. State Farm Mutual Auto. Ins. Co.*, 976 F.2d 573, 576 (9th Cir. 1992) (quoting *Admiral Ins. Co. v. United States District Court*, 881 F.2d 1486, 1494 (9th Cir. 1989)).

"[T]o qualify for protection against discovery under [Rule 26(b)(3)], documents must have two characteristics: (1) they must be 'prepared in anticipation of litigation or for trial," and (2) they must be prepared 'by or for another party or by or for that other party's representative.'" *In re Grand Jury Subpoena (Mark Torf/Torf Environmental Management*, 357 F.3d 900, 907 (9th Cir. 2004) (citing *In re California Public Utilities Commission*, 892 F.2d 778 780-81 (9th Cir. 1989)).

If a document serves a dual purpose, meaning that it serves "both a non-litigation and a litigation purpose," the Ninth Circuit applies the "because of" standard. *United States v. Richey*, 632 F.3d 559, 567 (9th Cir. 2011). Under this standard, a dual purpose document is considered prepared because of litigation if

"in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Richey*, 632 F.3d at 567.

"There are two kinds of work product – ordinary work product and opinion work product." *Kandel*, 683 F.Supp.2d at 1084 n. 5 (quoting *Baker v. General Motors Corp.*, 209 F.3d 1051, 1054 (8th Cir. 2000) and citing *Holmgren*, 976 F.2d at 577). Opinion work product, which includes "materials that reveal an attorney's mental impressions or opinions," is entitled to "special or heightened protection." *McKenzie Law Firm, P.A. v. Ruby Receptionists, Inc.*, 333 F.R.D. 638, 641 (D. Or. 2019) (citing *Admiral Ins. Co. v. United States Dist. Court for the Dist. of Arizona*, 881 F.2d 1486, 1494 (9th Cir. 1989); Fed. R. Civ. P. 26(b)(3)(B)). Opinion work product "is discoverable only 'when mental impressions are at issue in a case and the need for the material is compelling.'" *McKenzi*e, 333 F.R.D. at 641 (quoting *Holmgren*, 976 F.2d at 577)).

Ordinary work product, also called fact work product, "generally consists of factual material prepared in anticipation of litigation such as a factual statement obtained from a witness." *RFK Retail Holdings, LLC v. Tropicana Las Vegas, Inc.*, 2017 WL 2292818, at *5 (D. Nev. May 25, 2017). Ordinary work product includes the communication of "raw factual information." *Kandel*, 683 F.Supp.2d at 1084 n. 5. See *Upjohn Co. v. United States*, 499 U.S. 383, 395 (1981) ("The privilege only

24

protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney…."). Ordinary work product "may be ordered produced upon a showing of substantial need for the information and that the information cannot be otherwise obtained without undue hardship." *McKenzie*, 333 F.R.D. at 641 (citing *Admiral Ins. Co.*, 881 F.2d at 1494; Fed. R. Civ. P. 26(b)(3)(A)(ii).

The party claiming work product protection has the burden of demonstrating that the doctrine applies. *Kandel*, 683 F.Supp.2d at 1084 n. 5. Like the attorney-client privilege, work product protection is not absolute and may be waived. *Nobles*, 422 U.S. at 239; *United States v. Richey*, 632 F.3d 559, 567 (9th Cir. 2011). If the party asserting work-product protection meets its initial burden of establishing that the doctrine applies, the burden shifts to the party asserting waiver to demonstrate that a waiver has occurred. *McKenzie*, 333 F.R.D. at 641.

"The standards governing the waiver of work-product protection are narrower, or more restrictive, than the standards used for finding waiver of the attorney-client privilege." *McKenzie*, 333 F.R.D. at 646-47. Because "the purpose of work-product immunity is not to protect the evidence from disclosure to the outside world, but rather to protect it only from the knowledge of opposing counsel and client," as a general rule the "disclosure of a document to a third person does not waive work-product immunity" unless doing so "has substantially increased

the opportunity for the adverse party to obtain the information." *McKenzie*, 333 F.R.D. at 647 (quoting *Skynet Electronic Co., Ltd. v. Flextronics International, Ltd.*, 2013 WL 6623874, at *3 (N.D. Cal. Dec. 16, 2013)).

Kiesel argues that because of his agency relationship with Alexander, any work product prepared by Alexander in anticipation of litigation or for trial remains protected as if Kiesel or his counsel had created it. (Doc. 34 at 28). Again, Hyde does not dispute that Alexander was Kiesel's agent for purposes of assisting with the investigation, design, and eventual construction of a residence on the Property, but takes the position that an agency relationship is not enough to protect all communications under the work product doctrine. (Doc. 36 at 22). Hyde contends that Kiesel has not met his burden of demonstrating that the withheld communications were prepared in anticipation of litigation as required to qualify as work product, and even if he has met this burden, Kiesel has waived work product protection.

Kiesel asserts work product protection as a basis for withholding email exchanges involving (1) Alexander, Kiesel, and sometimes also Hayflick; (2) Alexander and Kiesel's counsel; and (3) Alexander, Kiesel, and Kiesel's counsel. Kiesel also claims work product protection for one email chain involving only counsel and law firm staff members. The Court will address each category in turn.

     a.    *Email exchanges involving Alexander and Kiesel*

First, Kiesel seeks work product protection for several communications solely between himself, Alexander, and sometimes also Hayflick. (Doc. 34-1, identifying Kiesel 634, 915, 936-937, 1293, 955, 1371-1374, 1375-1376, 1377-1379). The Court is not persuaded that these documents are anything more than discussions between a party and a fact witness, and certainly are not documents prepared for trial or in anticipation of litigation, or documents that might reveal the mental processes of Kiesel's attorneys. Because these materials were not prepared in anticipation of litigation or trial, they do not qualify for work product protection. See e.g. *Largan Precision Co., Ltd. v. Genius Electronic Optical Co., Ltd.*, 2015 WL 124557, at *6 (N.D. Cal. Jan. 8, 2015) (recognizing that while materials prepared by non-attorneys may enjoy work product protection, the fact that no attorneys were involved in the documents at issue was "a strong signal that they were not created because of the prospect of litigation").

> b.   *Email exchanges involving Alexander and Kiesel's attorneys*

Second, Kiesel claims work product protection for several email exchanges between Alexander and Kiesel's attorneys. (Doc. 34-1, identifying Kiesel 1034-1039,[6] 1276-1279, 1280, 1294, 1311-1368).

The emails found at Kiesel 1276-1279 and 1280 are primarily focused on

---

[6] Kiesel 1034-1039 is an email exchange containing work product that Kiesel's attorney forwarded to Alexander.

addressing the newly discovered sewer and utility lines on the Property, and

finding possible solutions, or on scheduling and other administrative matters. The

email found at Kiesel 1311-1368 is an email from Alexander to Kiesel's attorneys.

Alexander states that he was helping the Stock Farm re-write its design guidelines,

highlights a section of the design guidelines on easements, and provides a copy of

the design guidelines with his email. This email also relates to the newly

discovered sewer and utility lines on the Property, and finding possible solutions.

These communications do not appear to have been made because of litigation,

which means they was not made in anticipation of litigation or trial and therefore

do not qualify for work product protection. See *Largan Precision Co.*, 2015 WL

124557, at *6 (finding emails which reflected "the parties were focused on a

business resolution of the dispute, rather than litigation" were not protected work

product).

     The Court finds that the remainder of the email exchanges involving

Alexander, Kiesel, and Kiesel's counsel – Kiesel 1034-1039 and 1294 – were

made in anticipation of litigation or trial and therefore constitute work product.

        c.    *Email exchanges involving Alexander, Kiesel, and Kiesel's*
           *counsel*

     Kiesel further claims work product protection for several email exchanges

involving himself and/or Hayflick, his attorneys, and Alexander. (Doc. 34-1,

identifying Kiesel 913, 950-954, 1272-1275, 1295-1300, 1301-1303, 1304-1307,

1308-1309, 1310)

The email exchanges found at Kiesel 913, 1272-1275, 1308-1309, and 1310 were primarily focused on addressing the newly discovered sewer and utility lines on the Property, and finding possible solutions, or on scheduling and other administrative matters unrelated to litigation. These communications were not made because of litigation, which means they were not made in anticipation of litigation or trial and therefore do not qualify for work product protection.

The Court finds that the remainder of the email exchanges involving Alexander, Kiesel, and Kiesel's counsel – Kiesel 950-954, 1295-1300, 1301-1303, and 1304-1307 – were made in anticipation of litigation or trial and therefore constitute work product.

In sum, having performed an in camera review of the communications for which Kiesel claims work product protection, the Court finds that Kiesel has not met his burden of demonstrating that the following communications identified in the Privilege Log were made in anticipation of litigation or trial as required to qualify as work product: Kiesel 634, 913, 915, 936-937, 955, 1272-1275, 1276-1279, 1280, 1293, 1308-1309, 1310, 1311-1368, 1371-1374, 1375-1376, 1377-1379. Kiesel has, however, demonstrated that the following communications identified in the Privilege Log constitute work product: Kiesel 950-954 ,1034-1039, 1294, 1295-1300, 1301-1303, 1304-1307).

To the extent the materials identified in the preceding paragraph constitute work product, Hyde contends Kiesel has waived work product protection because he knew Alexander was a critical fact witness, but continued to communicate with him as a consultant. Hyde relies on *Gonzales v. United States*, 2010 WL 1838948 (N.D. Cal. May 4, 2010), a tax refund suit in which the plaintiff sought to protect communications between his attorney and accountant under the work product doctrine. *Gonzales*, 2010 WL 1838948, at *2. The court concluded the plaintiff had waived any work product protection because his accountant "was the tax preparer and an important fact witness." *Gonzales*, 2010 WL 1838948, at *2. The court reasoned that the plaintiff had created the dilemma by communicating with a third party fact witness, his accountant, "rather than hiring an accounting expert who was not involved in the underlying transaction." *Gonzales*, 2010 WL 1838948, at *2.

*Gonzales* is arguably analogous in that Kiesel continued communicating with a third party fact witness, his architect, rather than hiring a consultant who was not involved in the underlying events giving rise to this litigation. Notwithstanding this similarity, however, the Court declines to hold under the circumstance present here that Kiesel waived all work product protection.

## IV.   **Conclusion**

For the reasons set forth above, the Court concludes that (1) the materials

identified in the Privilege Log as Kiesel 1206-1207 are protected by the attorney-client privilege; and (2) the materials identified in the Privilege Log as Kiesel 950-954, 1034-1039, 1294, 1295-1300, 1301-1303, and 1304-1307 are protected work product.

All other materials identified in the Privilege Log must be produced.

IT IS SO ORDERED.

DATED this 16th day of May, 2023.

_____
Kathleen L. DeSoto
United States Magistrate Judge