IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| MARK R. KIESEL LIVING TRUST and MONTANA WOODS LLC, | CV 22-109-M-KLD |
| Plaintiffs, | |
| vs. | ORDER |
| THOMAS HYDE, | |
| Defendant. | |

Plaintiffs Mark R. Kiesel Living Trust and Montana Woods LLC (collectively "Kiesel") bring this action seeking rescission of, or damages arising out of, a real estate transaction with Defendant Thomas Hyde ("Hyde"). Hyde has filed a motion for summary judgment on all claims (Doc. 59), and Kiesel has filed a cross-motion for partial summary judgment (Doc. 54). The motions are fully briefed, and Court heard oral argument on August 16, 2024. For the reasons stated below, Hyde's motion for summary judgment is granted, Kiesel's cross-motion for partial summary judgment is denied, and this matter is dismissed.

## I.   <u>Background</u>

In November 1999, Hyde entered into a contract for deed with Stock Farm, LLC for the purchase of real property commonly known as NKN Stock Farm Rd., Lot 31, Hamilton, Montana ("Lot 31"). (Doc. 89 at ¶ 1; Doc. 84 at ¶ 1). Lot 31 is

located within the Stock Farm development ("Stock Farm"), a gated residential community featuring a private golf course and club. (Doc. 89 at ¶ 2). The residential portion of the Stock Farm is overseen by the Board of Directors of the Stock Farm Homeowners' Association ("Stock Farm HOA"). (Doc. 89 at ¶ 3).

Before purchasing Lot 31, Hyde, who is an attorney, was involved with founding the Stock Farm, including forming the relevant legal entities and establishing the Declaration of Protective Covenants, Conditions, Restrictions, and Easements for Stock Farm ("Covenants") that govern and regulate development within the Stock Farm subdivision. (Doc. 89 at ¶ 4). Lot 31 is subject to the Covenants, which are recorded in Ravalli County, Montana. (Doc. 84 at ¶ 2; Doc. 61-2). The Covenants provided for the creation of a Design Review Committee ("DRC"), which assists landowners in securing "the most desirable structure location on each Lot to take advantage of the surrounding views while securing views and privacy from adjacent neighbors." (Doc. 84 at ¶ 3; Doc. 61-2 at 28). The Covenants state that "[n]o building shall be constructed outside of the designated building envelope…unless otherwise approved by the Board of Directors and the DRC," and require that all utilities must "be installed and maintained below the surface of the ground. (Doc. 84 at ¶ 4; Doc. 89 at ¶ 96; Doc. 61-2 at 24, 25).

The Covenants further provide for the creation of "initial design and development guidelines and application and review procedures (the "Development

Guidelines"), which define "Building Envelope" as:

> [t]hat portion of any Lot designated as a Building Envelope on the Final Plat, and within which the construction of buildings and accessory and appurtenant structures and improvements is permitted. Horizonal improvements may be developed outside of the Building Envelope, i.e. ponds, decks, fencing, provided the improvements are in compliance with the DRC standards.

(Doc. 84 at ¶¶ 5-6). The building envelope for Lot 31 is depicted on the property plat. (Doc. 84 at ¶ 8; Doc. 61-4).

During Stock Farm's founding, Professional Consultants, Inc. ("PCI") was engaged to prepare the plat materials and otherwise accomplish the engineering work necessary to establish the Stock Farm's residential subdivision. (Doc. 89 at ¶ 6). Portions of the subdivision materials prepared and recorded by PCI depict the intended location of the subdivision's sewer line to run along the border between Lot 31 and an adjacent lot, Lot 33. (Doc. 89 at ¶ 8; Doc. 56-3). For some unknown reason, however, the entity responsible for installing the sewer line instead placed it across Lot 31 and just inside the northern boundary of its designated building envelope in an east-west direction. (Doc. 89 at ¶ 9; Doc. 56-5).

Although PCI updated the site plan on March 2, 1999, to show the actual location of the sewer line running through Lot 31, no easement was recorded. (Doc. 84 at ¶ 30; Doc. 61-12). However, the "as built" site plans were available to any member or prospective purchaser at the Stock Farm HOA offices. (Doc. 84 at ¶ 31).

3

In 2002, Hyde retained architect Robert Arrigoni ("Arrigoni") to design a home for Lot 31. (Doc. 84 at ¶ 9). Like Hyde, Arrigoni had been involved with the Stock Farm since its formation. (Doc. 89 at ¶ 61). Arrigoni obtained topographic information about Lot 31 that depicted a line running through the property with the designation "S", which is the industry designation for "sewer" in civil engineering surveys. (Doc. 89 at ¶¶ 12-14). Between March 2002 and July 2002, Arrigoni subsequently prepared three preliminary design drawings depicting "what might be possible" on" Lot 31. (Doc. 89 at ¶ 15; Doc. 56-7). The first drawing dated March 3, 2002, is identified as "Hyde Res. Plan Sk." and includes a line labeled "Sewer L" running east-west across Lot 31 within the designated building envelope ("First Drawing"). (Doc. 89 at ¶¶ 16-17; Doc. 56-7 at 1). The second drawing dated June 3, 2002, states "Hyde Lot 31" and shows a line labeled "S" crossing Lot 31 within the designated building envelope in an east-west direction ("Second Drawing"). (Doc. 89 at ¶ 18; Doc. 56-7 at 2). The third drawing dated July 27, 2002 depicts an unlabeled line in the same location as the "Sewer L" and "S" line included on the first and second drawings ("Third Drawing"). (Doc. 89 at ¶ 19; Doc. 56-7 at 3).

Hyde ultimately decided that he would not pursue the building project and would instead hold on to Lot 31 and let it appreciate. (Doc. 84 at ¶ 11). Hyde eventually listed Lot 31 with real estate brokers Bobbi Lockhart and Jim Schueler. (Doc. 84 at ¶ 14; Doc. 89 at ¶ 26). In 2020, Kiesel began looking at real estate in

the Bitterroot Valley, and retained Cindi Hayne of Glacier Sotheby's International Realty to assist him. (Doc. 84 at ¶¶ 15, 17). Kiesel and his partner at the time, Erika Hayflick, looked at several properties in and around the Stock Farm and eventually focused on Lot 31. (Doc. 84 at ¶ 18). Before presenting an offer, Hyde walked Lot 31 with Bob Webster, a builder who frequently does work within the Stock Farm, pointing out the location of a PVC pipe identifying the center point of the building envelope, which measures 150 by 150 feet. (Doc. 84 at ¶¶ 19-21).

On May 27, 2021, Kiesel presented an offer to purchase Lot 31 from Hyde for $850,000. (Doc. 89 at ¶ 38; Doc. 56-12). Hyde counteroffered, and on June 2, 2021, he and Kiesel agreed on a purchase price of $875,000. (Doc. 89 at ¶ 39; Doc. 56-12). The Buy-Sell Agreement included the following relevant terms and conditions:

> **PROPERTY INVESTIGATION:** This offer is contingent upon Buyer's independent investigation of the following conditions relating to the property, including but not limited to; covenants, zoning, access, easements, well depths, septic and sanitation restrictions, surveys or other means of establishing the corners and boundaries, special improvement districts, restrictions affecting use, special building requirements, future assessments, utility hook up and installation costs, environmental hazards, airport affected area, road maintenance obligations or anything else Buyer deems appropriate. Buyer agrees that any investigations or inspections undertaken by buyer or his/her behalf shall not damage or destroy the property, without the prior written consent of Seller. Further Buyer agrees to return the property to its original condition and to indemnify Seller from any damage or destruction to the property cause by the Buyer's investigations or inspections, if Buyer does not purchase the property. Release Date: June 11, 2021.

5

(Doc. 84 at ¶ 23; Doc. 61-8 at 4).

> **BUYER'S ACKNOWLEDGMENT:** Buyer acknowledges that prior verbal representations by the Seller or Seller's representatives do not modify or affect this Agreement. Buyer acknowledges that by signing this Agreement he/she has examined the subject real and personal property and represents that buyer has … visited the Property in person prior to the execution of this Agreement; has entered into this Agreement in full reliance upon his/her independent investigation and judgments and has read and understood this entire Agreement.

(Doc. 84 at ¶ 24; Doc. 61-8 at 9).

As set forth in the property investigation provision, the due diligence period associated with the purchase of Lot 31 ran from June 2, 2021, when Hyde's counteroffer was fully executed, to the June 11, 2021, release date specified in the Buy-Sell Agreement. (Doc. 89 at ¶ 45).

On June 7, 2021, after the Buy-Sell Agreement was fully executed, Hayne forwarded Kiesel a map showing the location Lot 31's building envelope, as well as the preliminary title commitment on an adjacent lot that Kiesel had previously considered purchasing, for informational purposes. (Doc. 84 at ¶ 27; Doc. 61-10). Hayne sent the preliminary title commitment to Lot 31, which is dated June 8, 2021, to Kiesel's Wyoming attorneys prior to closing. (Doc. 89 at ¶¶ 51; Doc. 89-9). Both of these preliminary title commitments disclosed the recorded Covenants, and included a special exception for an easement to the Montana Power Company permitting it to place gas lines throughout the subdivision. (Doc. 61-10 at 28; Doc. 89-9 at 6). The preliminary title commitments also referenced Montana

6

Department of Environmental Quality documents showing that the sewer line was

to follow the border between Lot 31 and Lot 33, and then run to the south of Lot

31. (Doc. 84 at ¶ 29; Doc. 56 at ¶ 53; Doc. 56-3; Doc. 61-11).

Also prior to closing, Kiesel asked his Wyoming attorney, Erika Nash, to

review information related to Lot 31. (Doc. 84 at ¶ 37). On June 15, 2021, Nash

offered her opinions regarding the property, including the following:

> Cindy and I chatted this am about the Montana transaction, and I reviewed
> the documents she provided to me. This is a platted subdivision with adopted
> covenants (CC&Rs) which control the development of the lot. There is a
> Design Review Committee (DRC), an arm of the HOA that will oversee
> approval of your construction…I mentioned to Cindi that the DRC likely has
> adopted design guidelines which are not recorded on title to keep them a bit
> more fluid and able to amend to keep up with construction best practices,
> and she mentioned you already have a copy, and are already engaging with
> an architect and building for construction on the lot. You also understand
> that your structures will be placed in the building envelope of the lot, which
> envelope has been established by the plat of the subdivision—again I
> mention these items to make sure you understand the use restrictions and are
> satisfied with them.

(Doc. 84 at ¶ 38).

Kiesel closed on the purchase of Lot 31 on or about June 29, 2021. (Doc. 89

at ¶ 57). By then, Kiesel had retained Arrigoni and architect Justin Alexander to

design a residence on the property. (Doc. 84 at ¶ 33). Arrigoni and Alexander were

both on the DRC, and were both familiar with the requirements for constructing a

residence within the Stock Farm. (Doc. 84 at ¶ 34; Doc. 89 at ¶ 6)

Kiesel gave Alexander and Arrigoni the parameters of designing a 7,000 to

8,000 square foot home with construction costs ranging from $500 to $600 per square foot, for a total construction cost ranging from $3.5 million to $4.8 million. (Doc. 84 at ¶ 47). The total construction costs did not include the purchase price of Lot 31 or the architectural fees that Kiesel would incur, which were estimated between $900,000.00 and $1 million. (Doc. 84 at ¶ 48).

After closing, Kiesel, Hayflick, Alexander, and Webster met at Lot 31 for a site visit, at which time Kiesel commented on his desire to build outside of the building envelope to the north to capture the view of Blodgett Canyon. (Doc. 84 at ¶ 40). During a subsequent site visit on August 16, 2021, the owner of the neighboring property, Henry Hunte, communicated to Kiesel's agents that he did not want any construction outside of the building envelope and would oppose any attempt to move the building envelope to the north. (Doc. 84 at ¶¶ 41-44). While on the property that day, Alexander and Arrigoni noticed a PVC riser sticking out of the ground. (Doc. 89 at ¶ 66). Alexander then contacted the Stock Farm's ranch manager, Bill Thomas, who confirmed that the sewer line was running through Lot 31 and within the building envelope. (Doc. 84 at ¶¶ 49-50).

Alexander retained engineer Craig Schaeffer to complete a survey of Lot 31 in order to locate the building envelope and the existing sewer line. (Doc. 84 at ¶ 51). Schaeffer created a diagram ("Utility Line Survey") that shows the sewer, gas, and electrical service lines (collectively "Utility Lines") crossing Lot 31 just south

of the northern boundary of the building envelope but north of the designated driveway. (Doc. 56-5; Doc. 62-6; Doc. 89 at ¶ 10). On October 19, 2021, Schaeffer sent an email to Alexander indicating that in addition to the sewer line, the natural gas and electrical service lines were also located within the building envelope. (Doc. 84 at ¶ 52).

Upon discovering the location of the Utility Lines, Alexander began looking at possible solutions, including either moving Lot 31's building envelope to the north or south, or moving the Utility Lines off Lot 31. (Doc. 84 at ¶¶ 54-55; Doc. 61-6 at 19-20). Of the options he identified, Alexander has testified that the only reasonable alternative was to move to move the Utility Lines entirely off Lot 31 at an estimated cost of $176,995. (Doc. 84 at ¶55; Doc. 61-16 at 20-21; Doc. 91-4 at 2).

At some point after the Utility Lines were discovered, Arrigoni looked through the file he had prepared while completing drawings for Hyde and found the Second Drawing dated June 3, 2002, which include the line labeled "S" crossing Lot 31 within the designated building envelope. (Doc. 84 at ¶ 61; Doc. 56-7 at 2). Arrigoni shared the drawing with Alexander, who then sent it to Kiesel. (Doc. 84 at ¶ 62). Kiesel concluded that Hyde must have known about the Utility Lines, and immediately retained counsel. (Doc. 84 at ¶ 64).

On December 6, 2021, Kiesel, through counsel, wrote to Hyde demanding

rescission of the Buy-Sell Agreement based on mutual mistake, and requested Hyde's assistance in unwinding the transaction. (Doc. 84 at ¶ 64; Doc. 64-1). Hyde refused to rescind the transaction, and Kiesel filed this lawsuit on June 21, 2022. (Doc. 1; Doc. 89 at ¶ 84). Kiesel claims that the existence of the Utility Lines, and their location on Lot 31, significantly impacts his ability to use and enjoy the property, and substantially decreases its value. (Doc. 27 at ¶ 23). He alleges that Hyde knew or should have known of the existence of the Utility Lines, and had a legal obligation to disclose their presence prior to the sale of Lot 31 but failed to do so. (Doc. 27 at ¶¶ 26-28).

Kiesel's Amended Complaint alleges seven claims for relief: (1) negligence (Count 1); (2) rescission (Count 2); (3) negligent misrepresentation (Count 3); (4) fraud (Count 4); (5) constructive fraud (Count 5); (6) punitive damages; and (7) breach of contract/attorney fees (Count 7). (Doc. 27 at ¶¶ 30- 89). Hyde moves for summary judgment on all seven claims (Doc 59), and Kiesel cross-moves for partial summary judgment on his rescission claim, or alternatively, his claims for actual or constructive fraud (Doc. 54). The Court addresses these claims in the order set forth below.

## II.   **Legal Standard**

Under Rule 56(c), a party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is

no genuine issue as to any material fact and that the movant is entitled to judgment

as a matter of law." A movant may satisfy this burden where the documentary

evidence produced by the parties permits only one conclusion. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 251 (1986). Once the moving party has satisfied its

burden, it is entitled to summary judgment if the non-moving party fails to

designate by affidavits, depositions, answers to interrogatories or admissions on

file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v.*

*Cattrett*, 477 U.S. 317, 324 (1986).

      "The mere existence of some alleged factual dispute between the parties will

not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S.

at 247–48 (emphasis in original). The non-moving party may not rest upon the

mere allegations or denials of the pleadings. *Anderson*, 477 U.S. at 248. Further,

inadmissible hearsay is insufficient to raise a genuine issue of material fact.

*Skillsky v. Lucky Stores, Inc.*, 893 F.2d 1088, 1091 (9th Cir. 1990).

      In considering a motion for summary judgment, the court "may not make

credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing*

*Prods.*, 530 U.S. 130, 150 (2000); *Anderson*, 477 U.S. at 249–50. The Court must

view the evidence in the light most favorable to the non-moving party and draw all

justifiable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020–21 (9th Cir. 2007).

When presented with cross-motions for summary judgment on the same matters, the court must "evaluate each motion separately, giving the non-moving party the benefit of all reasonable inferences." *American Civil Liberties Union of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

Where, as here, a contract dispute is in federal court based on diversity jurisdiction, the court applies the substantive law of Montana, the forum state. 28 U.S.C. § 1652; *Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc.*, 306 F.3d 806, 812 (9th Cir. 2002).

## III.   <u>Discussion</u>

### A.   **Constructive Notice**

As set forth in the Amended Complaint, Kiesel's claims are all premised on the theory that Hyde knew or should have known of the existence and location of the Utility Lines, and failed to disclose that information prior to the sale of Lot 31. (Doc. 27). In response to Kiesel's motion for partial summary judgment, Hyde raises what amounts to a threshold argument regarding constructive notice. (Doc. 95). Hyde argues that the Plat (Doc. 61-4), the Covenants (Doc. 61-3), and the Montana Power Company Easement (Doc. 89-10) provided Kiesel with constructive notice of the Utility Lines on Lot 31, which not only defeats Kiesel's

motion for partial summary judgment but entitles Hyde to summary judgment on all claims. (Doc. 95 at 9).

"An easement is a non-possessory interest in land that gives a person the right to use the land of another for a specific purpose[.]" *James v. Chicago Title Ins. Co.*, 339 P.3d 420, 423 (Mont. 2014). "Easements arise by express grant or reservation in a written instrument of conveyance, written declaration of covenant, operation of law (implication from necessity or prior use), or prescription." *O'Keefe v. Mustang Ranches HOA*, 446 P.3d 509, 515 (Mont. 2019), citing *Blazer v. Wall*, 183 P.3d 84, 93-94 (Mont. 2008).

"[T]o create an easement by express grant or reservation, an instrument of conveyance and any reference subdivision plat, certificate of survey, or map of record must be sufficient *together* to express clear and unambiguous grantor intent to grant or reserve an easement in a manner that clearly and unambiguously describes or otherwise manifests with reasonable certainty the intended dominant or servient estates, use, and location of the easement." *O'Keefe*, 446 P.3d at 516-17 (footnotes omitted) (emphasis in original). "[A] recorded document creating an easement imparts constructive notice of its contents." *James v. Chicago Title Ins. Co.*, 339 P.3d 420, 423 (Mont. 2014).

Hyde relies on the Plat, Covenants, and Montana Power Company Easement to argue that Kiesel had constructive notice of the utility easements on Lot 31. The

Plat, which was filed with the Ravalli County Clerk and Recorders office on December 31, 1997, states: "All properties shown hereon (lots, common areas, and golf course parcel "A") are subject to easements as necessary for the installation, operation and ongoing maintenance of private and public utilities that are in place at the time of the filing of this plat." (Doc. 61-4; Doc. 90-1).

In addition, the Covenants, which were also filed with Ravalli County Clerk and Recorder's office on December 31, 1997, expressly reserve a utility easement in favor of Stock Farm across all property within the subdivision, including Lot 31. (Doc. 91-9 at 33-34, 59-60). Section XIII of the Covenants provides:

> Easements for Utilities, Etc. There are hereby reserved unto the Declarant, so long as the Declarant owns any property described on Exhibit A of this Declaration, the Association, and the designees of each (which may include, without limitation, Ravalli County, Montana, and any utility) access and maintenance easements upon, across, over, and under all the Property to the extent reasonably necessary for the purpose of replacing, repairing, and maintaining…all utilities, including, but not limited to, water, sewers, meter boxes, telephone, gas, and electricity, and for the purpose of installing any of the foregoing on property which it owns or within easements designated for such purposes on the recorded plats of the Property. This easement shall not entitle the holders to construct or install any of the foregoing systems, facilities, or utilities over, under, or through any dwelling on a Lot, and any damage to a structure or improvement resulting from the exercise of this easement shall promptly be repaired by, and at the expense of, the person exercising the easement. The exercise of this easement shall not unreasonably interfere with the use of any Lot and, except in an emergency, entry onto any Lot shall be made only after reasonable notice to the Owner or occupant.

(Doc. 91-9 at 33-34).

The preliminary title commitments for Lot 31 and the adjacent lot disclosed

the recorded Covenants as well as an easement for the benefit of Montana Power Company, permitting it to lay gas lines throughout the subdivision. (Doc. 89 at ¶ 123; Doc. 92-2 at 11; Doc. 89-10). Schedule B, Part II of the title commitment for Lot 31 lists several exceptions to the title commitment, including Special Exception #17 which provides: "Easement to the Montana Power Company for a natural gas pipeline, communication system, and necessary appurtenances, recorded in Book 228 Deeds, page 243." (Doc. 89-9 at 6). The pipeline easement, recorded as Book 228 Deeds, page 243, provides: "Section(s) 22 through 27. An easement 10 feet in width for Natural Gas Pipelines within the Stock Farm Subdivision located within the above said sections." (Doc. 89-10 at 2). As reflected on the Plat, Lot 31 is within Sections 23 and 26. (Doc. 61-4).

Hyde argues based on these recorded documents that Kiesel had constructive knowledge of the utility easements and Utility Lines on Lot 31. Kiesel counters that not only is this argument incorrect, but it also is misplaced because it attempts to reframe this litigation as an easement dispute, when in fact the real issue is whether, as Kiesel claims, "Hyde's failure to disclose the existence and location on Lot 31 was the product of fraud or mistake." (Doc. 98 at 2).

Kiesel first contends that the documents Hyde relies on to establish constructive notice are insufficient. Kiesel relies on *Wild River Adventures, Inc. v. Bd. of Trustees of Sch. Dist. No. 8 of Flathead County*, 812 P.2d 344, 346 (Mont.

15

1991) for the proposition that the words "subject to" are not sufficient to create an easement. *Wild River* explained that the words "subject to" are commonly used in deeds to refer to existing easements that the grantor wishes to exclude from warranties of title, and "[t]here is nothing in the use of the words 'subject to', in their ordinary use, which would even hint at the creation of affirmative rights or connote a reservation or retention of property rights." *Wild River*, 812 P.2d at 346-47.

Applying *Wild River* here, Kiesel argues the Plat's statement that "[a]ll properties shown hereon are *subject to* easements as necessary for the installation, operation, and ongoing maintenance of private and public utilities…" does not create an easement by reservation for the Utility Lines. (Doc. 98 at 6, citing Doc. Doc. 90-1 (emphasis added). But even if the "subject to" language in the Plat was not sufficient to create any utility easements, the recorded Covenants referenced in the title commitment expressly reserved utility easements in favor of Stock Farm. (Doc. 61-4; Doc. 90-1).

Focusing next on the location of the Utility Lines, Kiesel argues he could not have had constructive notice that they were located inside the building envelope because the recorded documents did not describe the scope and actual, physical location of any utility easements on Lot 31. (Doc. 98 at 5). Anticipating this argument, Hyde maintains that "under Montana law, the lack of a precise

16

description of an intended easement is not fatal to an easement if the general

location of the intended easement is reasonably ascertainable from the instrument,

referenced plat, or other extrinsic evidence." (Doc. 95 at 15, citing *Yorlum*

*Properties, Ltd. v. Lincoln County*, 311 P.3d 748, 756-58 (Mont. 2013) and

*Anderson v. Stokes*, 163 P.3d 1273 (Mont. 2007)).

Hyde relies mainly on *Anderson*, in which the owners of a 160-acre parcel

granted the owner of a radio station an easement to erect and maintain radio towers

over "certain portions" of the property. The granting document did not identify the

specific location of the easement, stating that "the exact location of which is now

impossible to determine." *Anderson*, 163 P.3d at 1277. The radio station later

selected a site on the property and constructed two towers and accompanying

transmission lines, wires, and conduits over some 31 acres. *Anderson*, 163 P.3d at

1277. The later owner of the radio station sought to move the radio towers,

asserting he had an easement over all 160 acres. *Anderson,* 163 P.3d at 1277. The

Montana Supreme Court disagreed, and held that the radio station did not have an

easement over the entire 160 acres because the grant of the easement was over only

"certain portions" of the property, and once the radio station selected the site and

constructed the towers, the location of the easement was fixed to the location

originally selected. *Anderson*, 163 P.3d at 1284-86.

Analogizing to *Anderson*, Hyde argues that here, Stock Farm reserved the

right to place utility easements anywhere on the property, including Lot 31, and the installation of the Utility Lines fixed the location of the easement. But as Kiesel asserts in response, this argument is misplaced because he is not disputing that any utility easement Stock Farm has is fixed in the location where the Utility Lines were installed. Instead, Kiesel is asserting tort and contract claims against Hyde for failing to disclose the existence and location of the Utility Lines within the building envelope of Lot 31.

To the extent Hyde argues Kiesel was on constructive notice of the location of the Utility Lines because, if he had undertaken to locate the Utility Lines as part of his due diligence inquiry, he would have discovered they crossed Lot 31 within the building envelope, the Court is not convinced. There are no recorded easements depicting the location of the Utility Lines, and the Plat, title commitment, and Covenants do not depict the location of the Utility Lines. The publicly available DEQ documents referenced in the title commitment show that the sewer line was to follow the border between Lots 31 and 33. (Doc. 84 at ¶ 29). Hyde nevertheless asserts Kiesel was on constructive notice of the sewer line's actual location because PCI's "as-built" site plans (Doc. 90-2) were available to any member or prospective purchaser at the Stock Farm HOA offices. But Hyde fails to explain why, if the publicly available documents showed the sewer line following the border between Lots 31 and 33, due diligence would have required him inquire any

further. To the contrary, the Covenants state that utility lines were not to be installed "over, under, or through any dwelling on a Lot," and the exercise of utility easements "shall not unreasonably interfere with the use of any Lot." (Doc. 91-9 at 33-34). Consistent with the publicly available DEQ documents, this language suggests that utility lines would not be installed inside a designated building envelope. Because the publicly available documents did not show the Utility Lines crossing Lot 31, Kiesel was not on constructive notice of the location of the Utility Lines.

**B.    Negligence (Count 1), Negligent Misrepresentation (Count 3), Constructive Fraud (Count 5)**

Kiesel's claims of negligence, constructive fraud, and negligent misrepresentation are all based on the theory that Hyde knew or should have known of the existence and location of the Utility Lines, and failed to disclose that information prior to the sale of Lot 31. (Doc. 27 at ¶¶ 34-37, 53, 76). For example, Kiesel's negligence claim alleges that Hyde had "a duty to disclose the existence and location of the Utilities" and "breached that duty by failing to disclose the Utilities[.]" (Doc. 27 at ¶¶ 35-36). Kiesel's constructive fraud claim similarly alleges that Hyde "breached the duty he owed to [Kiesel] by failing to disclose known adverse material conditions," and his negligent misrepresentation claim alleges Hyde "made representations regarding the Property…and failed to disclose the existence and location of the Utilities." (Doc. 27 at ¶¶ 53, 76).

19

The parties agree that the presence of a legal duty is an essential element of Kiesel's claims for negligence, negligent misrepresentation, and constructive fraud. (Doc. 83 at 14). *See Geiger v. Department of Revenue*, 858 P.2d 1250, 1252 (Mont. 1993) (internal citations omitted) ("A fundamental tenet in the law of torts is that there can be no negligence if no duty exists."); *H-D Irrigating, Inc. v. Kimble Properties, Inc.*, 8 P.3d 95, 102 (Mont. 2000) ("The presence of a legal duty is an essential element of a claim for constructive fraud."); *Jackson v. State*, 956 P.2d 35, 43 (Mont. 1998) ("The presence of a duty to exercise due care is thus a requisite element of any claim for negligent misrepresentation.").

Hyde argues Kiesel cannot establish the legal duty necessary to support these claims because there is no duty to disclose information that a party does not possess, and the undisputed evidence demonstrates that Hyde did not have knowledge of the existence or location of the Utility Lines prior to the sale of Lot 31. Hyde relies on *Woodahl v. Matthews*, 639 P.2d 1165, 1169 (Mont. 1992) and a number of other cases applying Montana law for the threshold proposition that there is no duty to disclose information that a party does not possess. In *Woodahl*, the plaintiffs purchased a home from the defendant and later discovered that the floors in various rooms were not level. *Woodahl*, 639 P.2d at 1166-67. Before purchasing the home, the plaintiffs had asked the defendant whether there were any problems with the house, to which the defendant allegedly responded "[n]one

whatsoever." *Woodahl*, 639 P.2d at 1168. The plaintiffs later filed suit seeking recission of the contract and asserting a number of tort claims, including a claim for constructive fraud. *Woodahl*, 639 P.2d at 1167. The district court concluded that the defendant was not liable for constructive fraud because she was not aware of unlevel floors at the time of the sale. *Woodahl*, 639 P.2d at 1169.

The Montana Supreme Court affirmed, explaining that "knowledge of a defect is necessary before the duty to disclose the defect exists," and because the defendant was unaware of the defect at the time of the sale, "she was under no duty to disclose the defect" to the plaintiffs. *Woodahl*, 639 P.2d at 1169. *See also*, *Houdashelt v. Lutes*, 938 P.2d 665, 672 (Mont. 1997) (citing *Woodahl* for the rule that "if a party is unaware of a defect at the time of sale, he or she is under no duty to disclose it" and concluding the plaintiffs' constructive fraud claim failed as a matter of law because the defendant sellers were ignorant of the alleged defect in the sump system of the property at issue); *Young v. Era Advantage Realty,* 513 P.3d 505, 511 (Mont. 2022) (citing *Woodahl* for the same rule, and affirming summary dismissal of negligence and constructive fraud claims because without evidence that the defendant knew of previous water intrusion, the plaintiff could not prove that defendant owed her a duty to disclose any information pertaining to water damage and mold later discovered by the plaintiff); *Schulz v. Mountain West Farm Bureau Mut. Ins. Co.*, 2020 WL 4049871, at *5 (D. Mont. July 20, 2020)

("Had the evidence shown, on the other hand, that the defendants were unaware of the defects at the time of contracting, no duty to disclose would have been imposed, and the buyers would have been unable to rescind the sale contract on a constructive fraud theory.").

Kiesel does not address these cases, but argues that to prevail on the issue of duty with respect to his claims for constructive fraud, negligence, and negligent misrepresentation, he need only demonstrate that Hyde displayed a "want of ordinary care" for which it was foreseeable that Kiesel would be harmed. (Doc. 83 at 14). Kiesel cites *Jackson v. State*, 956 P.3d 35, 44-45 (Mont. 1998), which recognized that a "want of ordinary care" may give rise to liability for negligent misrepresentation" and proof of intent to misrepresent is not necessary. *Jackson*, 956 P.3d at 43. To the extent Kiesel relies on *Jackson* to argue he need only establish a duty of ordinary care in order to maintain his duty-based claims, the Court is not persuaded.

Kiesel's constructive fraud, negligence, and negligent misrepresentation claims are premised on specific allegations that Hyde was aware of the existence and location of the Utility Lines, and had a legal duty to disclose that information. (Doc. 27 at ¶¶ 35-36, 53, 76). *Jackson* is consistent with the *Woodahl* line of cases, which clearly hold that in the context of such duty-based tort claims, a party does not have a duty to disclose information the party does not possess.

Hyde argues Kiesel's duty-based claims fail as a matter of law because the undisputed evidence establishes that he did not have knowledge of the existence or location of the Utility Lines prior to the sale of Lot 31. At his deposition, Hyde testified that he visited Lot 31 a number of times before June 2, 2002 — the approximate date of Arrigoni's Second Drawing — and "never noticed anything that would indicate that there were utilities at any particular place on the lot." (Doc. 61-1 at 5 [140:4-18]). When asked if he had disclosed the existence of the underground Utility Lines to any potential buyers, Hyde answered: "I didn't know about any underground utility lines, so I couldn't disclose what I didn't know." (Doc. 56-1 at 21 [162:10-15]). Hyde maintains this deposition testimony establishes that he did not know prior to the sale to Kiesel that the Utility Lines were located on Lot 31, or that the Utilities Lines traversed the northern part of the building envelope. (Doc 60 at 21, citing Doc. 61 at ¶ 13).

Kiesel counters that, if anything, the undisputed facts establish the opposite—that Hyde did know about the existence and location of the Utility Lines and failed to disclose that information prior to the sale of Lot 31. As Kiesel describes it, that evidence includes the following: (1) Hyde's founding and longstanding involvement with the Stock Farm, including establishing the Covenants. (Doc. 56 at ¶¶ 4-5); (2) Hyde's receipt of Arrigoni's Second Drawing, which depicted a line labeled "S" running through Lot 31 and its building envelope

(Doc. 56 at ¶¶ 11-14, 18, 21); (3) Arrigoni's deposition testimony that he "is sure"
he provided Hyde with his first architectural drawing, which designated the line
"Sewer L" (Doc. 56 at ¶¶ 18-20); (4) the fact that Hyde had owned Lot 31 since
1999, but never constructed a residence on it (Doc. 56 at ¶¶ 1, 24); (5) evidence
that Hyde never made any disclosures regarding Lot 31 despite being asked to do
so (Doc. 56 at ¶¶ 45-46); and (6) the fact that despite refusing to rescind the
transaction based on mistake, Hyde's entire position in this case is that any failure
to disclose was the product of mistake (Doc. 56 at ¶¶ 83-84). (Doc. 83 at 14-15).

Kiesel contends that Hyde is not entitled to summary judgment on his claims
for constructive fraud, negligence, and negligent misrepresentation because, at a
minimum, this evidence creates a genuine issue of material fact as to whether Hyde
had knowledge of the existence and location of the Utility Lines as required to
establish a duty to disclose. In reply, Hyde simply asserts that Kiesel's "conclusory
and speculative assertions" that Hyde was aware of the existence and location of
the Utility Lines are not sufficient to survive summary judgment. (Doc. 100 at 8).

Kiesel's argument relies in large part on the three architectural drawings that
Arrigoni prepared for Hyde between March 2002 and July 2002. Arrigoni's First
Drawing depicts a line labeled "Sewer L" running east-west across Lot 31 within
the designated building envelope. (Doc. 89 at ¶ 17; Doc. 56-7 at 1). Arrigoni's
Second Drawing similarly shows a line labeled "S" crossing Lot 31 inside the

northern boundary of the designated building envelope. (Doc. 89 at ¶ 18; Doc. 56-7 at 2). Arrigoni's Third Drawing depicts an unlabeled line in the same location as the "Sewer L" and "S" line included on the First and Second Drawings. (Doc. 89 at ¶ 19; Doc. 56-7 at 3). At his deposition, Arrigoni testified that although he does not have any independent recollection of delivering the drawings to Hyde at the time, he is "sure that [he] did" and "assume[s]" that he did. (Doc. 89 at ¶ 20; Doc. 56-6 at 10 [100:25-101:9]). Arrigoni explained that it was his practice to always provide his clients with drawings prepared during informal projects, and he had no reason believe that he would not have done so in this case. (Doc. 89 at ¶ 20; Doc. 56-6 at 17 [185:1-9]).

Hyde, in turn, testified at his deposition that he does not recall seeing the First Drawing until this litigation was well underway (Doc. 56-1 at 17 [147:2-6]), but agreed the Second and Third Drawings "appear to be the drawings that [Arrigoni] had prepared for us" in 2002. (Doc. 56-1 at 17 [148:2-4]). Along the same lines, Hyde further testified that "[t]he second and third drawings are clearly what [he]…understood or recall[ed] that [Arrigoni] was preparing for us," but "[t]he first one, to [Hyde's] recollection, was not part of what was disseminated to us or reviewed by us" at the time. (Doc. 56-1 at 18 [150:11-19]).

Fairly read, Hyde's deposition testimony reflects that the Second and Third Drawings were part of the materials he received from Arrigoni in 2002. Whether

Arrigoni also provided Hyde with the First Drawing depicting a "Sewer Line"
running through the building envelope, however, is disputed. Hyde has testified
that he does not recall seeing the drawing until a few weeks before his deposition,
but Arrigoni has testified that he is sure he gave all three drawings to Hyde because
it was his practice to do so. But even assuming he received all three of Arrigoni's
drawings, Hyde appears to argue the drawings would not have been sufficient to
put him on notice of the sewer line's actual location within Lot 31's building
envelope. The Court agrees.

Hyde points to Arrigoni's deposition testimony that he does not know why
he labeled the line in his First Drawing "Sewer Line," and had just assumed it was
a sewer line. (Doc. 95 at 22, citing Doc. 56-6 at 8 [90:20-24]). Addressing his First
and Second Drawings, Arrigoni further testified:

> On that drawing—on that particular copy of a drawing that I got, this was
> shown on it. I don't recall that it was called a sewer line, that might be
> something—that might have been my assumption, okay? I believe that one
> of the drawings showed the line and it just shows S on the line, it doesn't
> specify that it's a sewer line.

(Doc. 56-6 at 8 [92:4-9]). Still addressing his drawings, Arrigoni explained that the
sewer line was not a concern of his at the time, since he was just preparing a
"sketch and we were working on an informal basis and there were not consultants
involved, I wasn't worried about the line at all, you know, because I knew that if it
were to become a real project, we would have had engineering consultants

26

involved and they would have addressed the issue of that that line was and the ramifications for it— ". (Doc. 89 at 6).[1] That apparently did not happen until after Hyde and Kiesel closed on the sale of Lot 31 in June 2021, when Arrigoni retained Schaeffer to complete the Utility Line Survey showing that the Utility Lines were all located within the building envelope.

Consistent with Arrigoni's testimony, Hyde points out that the lines on each of Arrigoni's three drawings do not accurately depict the utility lines as they appear to cross the building envelope to the south of the depicted driveway (Doc. 56-7), which is different than the actual location depicted in the Utility Line Survey (Doc. 56-5). Additionally, when Arrigoni was asked whether the line he identified as a sewer line in his drawings was in the same location as the section line on the plat, Arrigoni responded, "It sure does." (Doc. 89-3 at 7 [104:1-22]). Consistent with Arrigoni's testimony, the plat of Lot 31 (Doc. 61-4) shows a section line for Sections 23 and 26 in approximately the same location as the "Sewer Line" and "S" line in Arrigoni's drawings (Doc. 56-7 at 1-2).

The uncontroverted evidence thus shows that Arrigoni was not certain of, or even concerned about, the location of the sewer line at the time he created his three drawings, and the drawing do not accurately depict the sewer line's actual location.

---

[1] Although this portion of Arrigoni's deposition does not appear to be among the exhibits before the Court, the accuracy of this statement is not in dispute.

Accordingly, even assuming Hyde received all three of Arrigoni's drawings, they would not have put him on notice of the actual location of the sewer line within Lot 31's building envelope.

The additional evidence that Kiesel relies on to bolster his argument that Hyde had knowledge of the existence and location of the Utility Lines is insufficient to raise a material factual dispute. For example, Kiesel cites evidence that Hyde was involved with founding the Stock Farm, including establishing the relevant legal entities and Covenants. (Doc. 89 at ¶ 4). While the Covenants reserved a utility easement in favor of Stock Farm and required that all utility lines be placed underground, the Court fails to see how that would have put Hyde on notice that the Utility Lines for Lot 31 were located inside the building envelope. Kiesel next cites the fact that Hyde ultimately decided not to pursue the building project on Lot 31 (Doc. 84 at ¶¶ 10, 11), and speculates this may have been because he knew the Utility Lines were inside the building envelope. This theory is counter to Hyde's testimony that he decided not to pursue the project because he wanted to let the property appreciate, and is too speculative to withstand summary judgment. Kiesel also argues the fact that Hyde claims any failure to disclose on his part was the product of mistake constitutes evidence supporting a duty to disclose. The Court fails to see how the fact that Hyde may have been mistaken as to the location of the Utility Lines supports Kiesel's argument that Hyde did in fact

know where the Utility Lines were located.

Even construing the evidence in the light most favorable to Kiesel, and drawing all justifiable inferences in his favor, Kiesel fails to raise a genuine issue of material fact as to whether Hyde knew before he sold Lot 31 that the Utility Lines were located within the designated building envelope as required to establish a duty to disclose. Accordingly, Kiesel's duty-based claims for negligence, negligent misrepresentation, and constructive fraud fail as a matter of law.

### C.   Breach of Contract (Count 7)

Kiesel's breach of contract claim alleges that Hyde materially breached the Buy-Sell Agreement "by failing to disclose information regarding the existence and location of" the Utility Lines, and seeks attorney fees based on a provision in the Buy-Sell Agreement allowing a prevailing party to recover attorney fees incurred to enforce the contract. (Doc. 27 at ¶¶ 85-89).

"The construction and interpretation of a written contract is a question of law." *Wurl v. Polson Sch. Dist. No. 33*, 127 P.3d 436, 441 (Mont. 2006). To prevail on a claim for breach of contract, a plaintiff must establish (1) the existence of a valid and enforceable contract; (2) breach of an express or implied contract duty or obligation; and (3) resulting contract damages. *Kostelecky v. Peas in a Pod LLC*, 518 P.3d 840, 859-60 (Mont. 2022) (citing *Tin Cup Cty. Water & Sewer Dist. v. Garden City Plumbing & Heating, Inc.*, 200 P.3d 60, 68-70 (Mont. 2009)).

Hyde argues he is entitled to summary judgment on Kiesel's breach of contract claim because there is no evidence that he breached any express or implied obligations under the Buy-Sell Agreement. As with his duty-based claims, Kiesel's claim for breach of contract is premised on the allegation that Hyde failed to disclose information regarding the existence and location of the Utility Lines. (Doc. 27 at ¶ 87). Hyde contends he did not have any information related to the existence and location of the Utility Lines, but even if he did, he did not have a contractual duty to disclose such information because the express terms of the Buy-Sell Agreement establish that Kiesel was purchasing Lot 31 based on his own due diligence investigation of the property.

Hyde points to the Buy-Sell Agreement's property investigation provision, which makes clear that the purchase was contingent on Kiesel's "independent investigation" of the property, including "covenants, zoning, access, easements, well depths, septic and sanitation restrictions, surveys or other means of establishing the corners and boundaries, special improvement districts, restrictions affecting use, special building requirements, future assessments, utility hook up and installation costs, environmental hazards, airport affected area, road maintenance obligations or anything else the Buyer deems appropriate." (Doc. 84 at ¶ 23). Additionally, Hyde notes that Kiesel acknowledged within the Buy-Sell Agreement that any prior verbal representations by Hyde or his representatives did

not modify or affect the agreement, and that Kiesel was entering the agreement in full reliance on his own independent investigation. (Doc. 84 at ¶ 24).

Hyde contends he fulfilled his obligations under the Buy-Sell Agreement by providing Kiesel with a Warranty Deed to Lot 31 (Doc. 84 at ¶ 39), and argues that because "Kiesel has not and cannot identify a single provision within the Buy-Sell Agreement that Hyde did not fulfill," Kiesel's breach of contract claim fails as a matter of law. (Doc. 60 at 18).

Kiesel counters that Hyde is not entitled to summary judgment on his breach of contract claim because there are genuine issues of material fact as to: (1) whether Hyde breached the implied covenant of good faith and fair dealing; and (2) whether Hyde breached the terms of the Buy-Sell Agreement by failing to convey Lot 31 free of all encumbrances, except those identified in the title insurance commitment.

### 1.    Implied Covenant of Good Faith and Fair Dealing

"[E]very valid contract, regardless of type, contains an implied covenant of good faith and fair dealing." *Story v. City of Bozeman*, 791 P.2d 767, 775 (Mont. 1990), *overruled on other grounds by Arrowhead School District No. 75 v. Klap*, 79 P.3d 250, 264 (Mont. 2003). "The covenant is a mutual promise implied in every contract that the parties will deal with each other in good faith and not attempt to deprive the other party of the benefits of the contract through dishonesty

or abuse of discretion in performance." *Knucklehead Land. Co., Inc. v. Accutitle, Inc.*, 172 P.3d 116, 121 (Mont. 2007). "The conduct required by the implied covenant of good faith and fair dealing is honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Mont. Code Ann. § 28-1-211 (2023). The nature and extent of the obligations of good faith and fair dealing are measured by the "justifiable expectations" of the parties, and a "breach of the covenant constitutes a breach of the contract." *Hardy v. Vision Service Plan*, 120 P.3d 402, 405 (Mont. 2005).

It is undisputed that Kiesel paid $875,000 to obtain an undeveloped lot within the Stock Farm's residential development, for the purpose of constructing a residence. (Doc. 56 at ¶¶ 1-3, 39, 41). Kiesel claims he justifiably expected that he was purchasing an immediately buildable lot, but instead took title to a lot encumbered by Utility Lines that he asserts rendered the property "unbuildable, unmarketable, and diminished in value." (Doc. 83 at 10). Kiesel argues Hyde violated reasonable commercial standards of fair dealing by failing to disclose the existence and location of the Utility Lines on Lot 31 despite Kiesel's affirmative request for disclosures. (Doc. 83 at 10-11). At a minimum, Kisel contends, factual disputes regarding the scope and extent of Hyde's knowledge as to the existence and location of the Utility Lines precludes summary judgment. (Doc. 83 at 11).

As addressed above, however, the undisputed evidence establishes that

Hyde did not have knowledge of the location of the Utilities Lines prior to selling

Lot 31, and Kiesel's allegations to the contrary are insufficient to raise a factual

issue. This is fatal to Kiesel's claim for breach of the implied covenant, which is

premised on the allegation that Hyde failed to disclose information regarding the

existence and location of the Utility Lines. (Doc. 27 at ¶ 87). Because Kiesel has

not provided evidence that Hyde acted dishonestly or acted in a manner that was

commercially unreasonable in the context of their real estate transaction, Hyde is

entitled to summary judgment on Kiesel's claim that he breached the implied

covenant of good faith and fair dealing.

2.    Express Terms of the Contract

Turning to the express terms of the contract, Kiesel argues there are genuine

issues of material fact as to whether Hyde breached the terms of the Buy-Sell

Agreement by failing to convey Lot 31 free of all encumbrances, except those

identified in the title insurance commitment. (Doc. 83 at 11-12). The Buy-Sell

Agreement's conveyance provision required Hyde to convey Lot 31 "free of all

liens and encumbrances, except those described in the title insurance commitment,

as approved by [Kiesel]." (Doc. 61-8 at 5). According to Kiesel, nothing in the title

insurance commitment notified him that the Utility Lines ran through Lot 31 or its

building envelope. Kiesel contends that to the contrary, publicly recorded

documents show the sewer line running along the boundary of Lot 31, not across it

and the building envelope. (Doc. 84 at ¶ 29; Doc. 56 at ¶ 53; Doc. 56-3).

But according to Hyde, Kiesel's argument is without merit because the utility easements were in fact identified in the title insurance commitment. The title insurance commitment expressly disclosed the Covenants, which are recorded against real property that includes Lot 31. (Doc. 84 at ¶ 28; Doc. 61-10; Doc. 89-9). Section XIII of the Covenants reserves a utility easement in favor of Stock Farm across all property within the subdivision. (Doc. 89 at ¶ 104; Doc. 91-9 at 33, 59-60).

Subsection 13.2 specifically reserves an easement in favor of Stock Farm over all property within the subdivision "for the purpose of installing [all utilities] on the property which it owns or within easements designated for such purposes on recorded plats of the Property." (Doc. 89 at ¶ 104; Doc. 91-9 at 33). Subsection 13.2 further provides: "This easement shall not entitle the holders to construct or install any of the foregoing…utilities over, under or through any dwelling on a Lot, and any damage to a structure or improvement resulting from the exercise of this easement shall promptly be repaired by, and at the expense of, the person exercising the easement." (Doc. 89 at ¶ 104; Doc. 91-9 at 33).

In addition, Hyde notes that the title commitment identifies an express easement for a natural gas pipeline held by the Montana Power Company. (Doc. 84 at ¶ 28). Specifically, one of the special exceptions to the title commitment

provides an "Easement to The Montana Power Company for a natural gas pipeline, communication system and necessary appurtenances, recorded in Book 228 Deeds, page 243." (Doc. 61 at ¶ 28; Doc. 89-9 at 6 ). As recorded in Book 228 Deeds, page 243, provides: "Section(s) 22 thru 27. An easement 10 feet in width for Natural Gas Pipelines within the Stock Farm Subdivision located within the above said sections." (Doc. 89 at ¶ 124; Doc. 89-10). Lot 31 is within Sections 23 and 26 (Doc. 90-1), meaning that the easement covered the entirety of Lot 31. (Doc. 61 at ¶ 28).

Kiesel's argument that Hyde breached the express terms of the Buy-Sell Agreement is without merit. The Buy-Sell Agreement simply required Hyde to convey Lot 31 free of all encumbrances, except those described in the title insurance commitment. (Doc. 61-8 at 5). The title insurance commitment reserved an easement in favor of Stock Farm for the purpose of installing all utilities on the property, including on Lot 31. Although the title insurance commitment did not notify Kiesel that the Utility Lines crossed Lot 31 or its building envelope, the Buy-Sell Agreement did not require that it do so. As required by the Buy-Sell Agreement, Hyde conveyed Lot 31 free of all encumbrances, except the utility easements described in the title insurance commitment.

### D.   Actual Fraud (Count 5)

Actual fraud occurs when, "with the intent to deceive another party to the

contract or to induce the other party to enter into the contract," a party (1) suppresses facts he either knows or believes; or (2) commits any other act "fitted to deceive." Mont. Code Ann. § 28-2-405(3), (5). Fraud, including fraudulent intent, may be established by circumstantial evidence. *See Walker v.* Mink, 158 P.2d 630, 636 (Mont. 1945); *Roman v. Albert*, 264 P. 115, 119 (Mont. 1928).

Kiesel's fraud claim alleges that Hyde "made representations as to the condition of" Lot 31 and failed to disclose the existence and location of the Utility Lines with the intent to deceive and to induce Kiesel into entering the Buy-Sell Agreement. (Doc. 27 at ¶¶ 60-67).

To the extent Kisel alleges that Hyde "made representations as to the condition of the Property" (Doc. 27 at ¶ 62), Hyde argues he is entitled to summary judgment because there is no evidence that he or agents ever made any representations regarding Lot 31. (Doc 50 at 22). In response, Kiesel clarifies that, like his other claims, his fraud claim is premised solely on Hyde's alleged failure to disclose the existence and location of the Utility Lines. (Doc. 83 at 16-18).

As addressed above, the undisputed evidence show that Hyde did not have knowledge of the existence and location of the Utility Lines before selling Lot 31. Accordingly, Kiesel's fraud claim fails as a matter of law.

### E.    Rescission (Count 2)

Count 2 of the Amended Complaint, which is the subject of cross-motions

for summary judgment, alleges that rescission of the Buy-Sell Agreement is required regardless of whether Hyde was aware of the existence and location of the Utility Lines. (Doc. 27 at 7-9).

Under Montana law, a party may rescind a contract "[i]f the consent of the party rescinding or of any party jointly contracting with him was given by mistake or obtained through … fraud[.]" Mont. Code Ann. § 28-2-1711(1). Kiesel alleges a right to rescind the Buy-Sell Agreement based on fraud or mistake. (Doc. 27 at ¶¶ 39-50).

1.      Actual or Constructive Fraud

Montana law recognizes two kinds of fraud: actual fraud and constructive fraud. Mont. Code Ann. § 28-2-404. As stated above, actual fraud occurs when, "with the intent to deceive another party to the contract or to induce the other party to enter into the contract," a party (1) suppresses facts he either knows or believes; or (2) commits any other act "fitted to deceive." Mont. Code Ann. § 28-2-405(3), (5). Constructive fraud occurs when a party breaches a duty that "without an actually fraudulent intent, gains an advantage … by misleading another person to that person's prejudice." Mont. Code Ann. § 28-2-406.

Assuming Hyde was aware of the existence and location of the Utility Lines, Kiesel argues rescission is warranted because his consent to the Buy-Sell Agreement was based on Hyde's fraud in failing to disclose that information. (Doc.

27 at ¶ 48). As addressed above, however, the undisputed evidence show that Hyde did not have knowledge of the existence and location of the Utility Lines before selling Lot 31, which means that Kiesel's claims for actual and constructive fraud fail as a matter of law. Consequently, Kiesel's claim for rescission based on fraud also fails as a matter of law.

2.   Mutual Mistake

Kiesel also seeks rescission based on mutual mistake, which "occurs when, at the time the contract is made, the parties share a common misconception about a vital fact upon which they based their bargain." *South v. Transportation Ins. Co.*, 913 P.2d 233, 235 (Mont. 1996) (citation omitted). To warrant rescission, the mutual mistake "must be so substantial and fundamental as to defeat the object of the parties in making the contract." *South*, 913 P.2d at 235. *See also*, *Carey v. Wallner*, 725 P.2d 557, 560 (Mont. 1986) (to justify rescission based on mutual mistake the "mistake must be material, or, in other words, so substantial and fundamental as to defeat the object of the parties").

Assuming, as the Court has concluded above, that the undisputed evidence shows Hyde was unaware of the existence and location of the Utility Lines before closing on the sale of Lot 31, Kiesel argues rescission is warranted because both parties entered into the Buy-Sell Agreement based on a mutual mistake of fact that was material to the transaction. Hyde advances two counterarguments: (1) Kiesel is

not entitled to rescission because he bore the risk of the mistake under the terms of

the Buy-Sell Agreement and; (2) even if the parties were mistaken as to the

existence and location of the Utility Lines, the mistake was not so material as to

have defeated the object of the transaction. Because it is dispositive of Kiesel's

rescission claim, the Court addresses Hyde's materiality argument first.

Hyde relies again on *Woodahl*, in which the plaintiffs sought to rescind a

contract for the purchase of the defendant's home based on the defendant's failure

to disclose that the floors in parts of the building were not level. *Woodahl*, 639

P.2d at 1166. The state district court rejected the rescission claim, and the Montana

Supreme Court affirmed, citing the district court's reasoning with approval:

> Woodahls received the property for which they bargained. No condition of
> the home renders it uninhabitable or unfit for the purposes which they
> intended. Insofar as the purpose of the agreements was to furnish the
> Woodahls with a home to live in, that purpose was not frustrated by the
> unlevel condition of a portion of the home.

*Woodahl*, 639 P.2d at 1169. The Supreme Court thus concluded that even if there

had been a mutual mistake, "the mistake did not affect the object of the parties in

making the contract" and rescission was not an appropriate remedy. *Woodahl*, 639

P.2d at 1169.

Hyde also relies on *Halcro v. Moon*, 733 P.2d 1305, 1306 (Mont. 1987), in

which the buyers of a house sought to rescind the buy-sell agreement after

discovering water on the floor of a utility room and adjacent bathroom due to a

39

leaky water line. The seller offered to cover the cost of repairs—which took one week to complete and did not inconvenience the family living there at the time—but the buyers decided not to purchase the house and later sought to rescind the contract based on mistake of fact and failure of consideration. *Halcro*, 733 P.3d at 1306 The Montana Supreme Court affirmed the summary dismissal of the rescission claim,   because the buyers "offered no evidence that the water problems were so substantial as to defeat the object of the contract." *Halcro*, 733 P.2d at 1307. *See also, Turner v. Ferrin*, 77 P.2d 335, 336-39 (Mont. 1988) (concluding that an acreage discrepancy of approximately six percent between a buy-sell agreement's legal description of the property as containing "96.73 acres, more or less," and a survey showing the actual acreage at 90.73 acres did not provide a basis for rescission).

Analogizing to these cases, Hyde argues the existence and location of the Utility Lines just inside the northern border of the building envelope does not defeat the object of the parties in entering the Buy-Sell Agreement. It is undisputed that Kiesel purchased Lot 31 for the purpose of building a residence on the property. Kiesel contends that the Utility Lines have rendered Lot 31 unbuildable, largely unmarketable, and severely devalued, thereby defeating the purpose of the Buy-Sell Agreement. (Doc. 55 at 7, 27).

To support his assertion that Lot 31 is unbuildable, Kiesel relies on his own

deposition testimony that, in his view, the lot is "not buildable," (Doc. 56-8 at 11 [62:9-19]), as well as testimony provided by Alexander, Arrigoni, Hyde, and Hayflick. (Doc. 89 at ¶ 87). Alexander testified that they could not build a house on top of a sewer line, and unless the sewer line was moved, the house he had designed for Kiesel "would not happen" (Doc. 56-4 at 20 [133:6-12], 25 [161:10-21]). Arrigoni also testified that house cannot be built on top of a sewer line, explained that it would be "fairly difficult" to build a house "especially relative to trying to get a better view," and would not "advocate building a house on Lot 31 in the current envelope." (Doc. 56-6 at 9 [96-18-23], 18 [192:8-19]). Hyde testified that Arrigoni would "never design a house on top of a utility line" (Doc. 56-1 at 14 [137:21-23]), and Hayflick testified that the utility line "issues needed to be resolved before the property is buildable." (Doc. 56-10 at 25 [213:1-5]).

Hyde does not dispute that a house cannot be built over a sewer line, but provides undisputed evidence the location of the Utility Lines within the northern border of the building envelope do not render Lot 31 unbuildable. The record reflects that the building envelope is 150 feet by 150 feet, providing 22,500 square feet in which to construct a home. (Doc. 84 at ¶ 21). Kiesel testified that he intended to build a residence that was 7,000 to 8,000 square feet in size, with a total construction cost ranging from $3.5 million to $4.8 million. (Doc. 84 at ¶ 47). Hyde's expert, licensed real estate appraiser Steve Hall, has concluded that even

with the Utility Lines crossing the building envelope in their current location,

"[t]he encumbered building envelope has a net usable size of 18,650 SF (reduced

from the defined envelope of 22,500 SF) which satisfies almost any residential

structure in the Stock Farm." (Doc. 66-1 at 16). Hall explains that the mean or

average main floor size of the ten homes near Lot 31 is 3,634 square feet and when

adding the garage space and patio/deck space, the mean footprint of these ten

houses is 5,874 square feet. (Doc. 66-1 at 16). Hall states that "in reflecting a

typical or average footprint of 5,874 SF is clearly supported by the net building

envelope for [Lot 31] of 18,650 SF." (Doc. 66-1 at 16). [2] This undisputed evidence

refutes Kiesel's assertion that Lot 31 is unbuildable due to the location of the

Utility Lines.

At oral argument, Kiesel took the position that even if Lot 31 is still

buildable, the location of the Utility Lines is material to the transaction because he

did not get what he bargained for—a lot with an entirely unencumbered building

---

[2] To refute Kiesel's argument that Lot 31 is unbuildable, unmarketable, and
diminished in value, Hyde relies in part on the expert report of Steve Hall, which is
the subject of a motion in limine. (Doc. 89 at ¶¶ 87-89) Hall was asked to provide
an opinion "as to whether the location of the utilities (the mutual mistake) is so
substantial and fundamental as to defeat the object of the contract." (Doc. 66-1 at
11). Hall concludes that the location of the Utility Lines does not defeat the object
of the contract based on the evidence discussed below. While Hyde's ultimate legal
conclusions on this issue are not admissible, Hyde's factual conclusions as to the
net usable size of the building envelope, and the residential footprint supported by
the net building envelope, are admissible and support the conclusion that Kiesel is
not entitled to rescission.

envelope. This argument is undercut by *Woodahl*, which held that notwithstanding the home's unlevel floors, the plaintiffs received the property for which they had bargained because the home was habitable. *Woodahl*, 639 P.2d at 1169. Here, as in *Woodahl,* Kiesel received the property for which he bargained. It is undisputed that Kiesel purchased Lot 31 for the purpose of constructing a residence. Kiesel received the property for which he had bargained because the undisputed evidence demonstrates that even with the Utility Lines in their current location just within the northern boundary of the building envelope, it is possible to build a residence on Lot 31 that is comparable in size to other residences in the Stock Farm subdivision.

To support his assertion that Lot 31 is not currently marketable, Kiesel relies on his own deposition testimony that if someone else bought the property and knew there were utility lines inside the building envelope, "they would come to the same conclusion" that the property is not buildable. (Doc. 89 at ¶ 89, citing Doc. 56-8 at 8 [49:9-23]). As addressed above, however, the undisputed evidence demonstrates that the property is in fact buildable.

Kiesel also relies on Hayne's testimony that, in her opinion, Lot 31 "is currently not marketable without, at a minimum, firm or concrete guarantees to relocate the lines or, even better, the actual relocation of the lines outside of the subject property or along its boundary line." (Doc. at ¶ 89, citing Doc. 56-9 at 17

[111:8-113:10]). Kiesel additionally relies on Hayne's deposition testimony as evidence that Lot 31 has diminished value. (Doc. 89 at ¶ 89, citing Doc. 56-9 at 21-22 [163:17-166:24]).

To the extent Lot 31 is unmarketable and has diminished value due to the location of the Utility Lines, Hyde argues rescission is not warranted because the evidence demonstrates that the issue can be remedied at a cost of less than $30,000. (Doc. 60 at 29; Doc. 100 at 13). In June 2023, NorthWestern Energy prepared a price quotation that it would cost $6,724.00 to move the move the natural gas line out of the building envelope. (Doc. 84 at ¶ 71, citing Doc. 64-4). In May 2023, Ravalli County Electric Cooperative prepared a price question that it would cost $22,735.00, including a $5,000.00 contingency, to move the electrical line outside the building envelope. (Doc. 84 at ¶ 72, citing Doc. 64-5). Ryan Guibarra, a member of the Stock Farm HOA, testified that if the Ravalli County Electric and NorthWestern Energy both agreed to move their utility lines, the Stock Farm HOA would likely have paid to the move the sewer line. (Doc. 61 at ¶ 57, citing Doc. 63-3 at 4 [96:15-97:16]). Hyde relies on this evidence to demonstrate that it would cost only $29,459.00 to relocate the Utility Lines.

It is undisputed that Kiesel gave Alexander and Arrigoni the parameters of designing a residence with a total construction cost ranging from $3.5 million to $4.8 million. (Doc. 84 at ¶ 47). It is also undisputed that the total construction cost

did not include the purchase price of $875,000, or architectural fees that were estimated between $900,000 and $1 million. (Doc. 84 at ¶ 48). Given the total project cost of between $5,275,000 and $6,675,000, Hyde argues an expenditure of $29,450 to move the Utility Lines is so insignificant that "[n]o reasonable juror could find that the cost to remedy the issue is so substantial as to defeat the object of the parties in making the contract." (Doc. 100 at 13-14).

Although Kiesel contends in response that the estimates Hyde relies on are outdated, he does not provide any more recent estimates to controvert the prices quoted by NorthWestern Energy and Ravalli County Electric. Kiesel does, however, point to an October 26, 2021 email from Alexander stating that based on his civil engineer's discussions with sub-contractors "the price increased by basically 2x which seems more accurate to me." (Doc. 91-2). Even assuming a 100% increase in the cost to relocate move the gas and electrical service lines to $58,900, the amount is so insignificant in comparison with the total project cost as to be immaterial.

Keisel has also come forward with evidence that the Stock Farm HOA has since changed its position and made clear that it will not pay to move the sewer line. (Doc. 106-1 at 26). Alexander has estimated—without any evidentiary support—that it would cost $176,995 to move the Utility Lines entirely off Lot 31. (Doc. 84 at ¶ 55; Doc. 61-16 at 20-21; Doc. 91-4 at 2). If, as the uncontroverted

evidence submitted by Hyde shows, it would cost a total of $29,450 to move the gas and electrical service lines, it does not seem plausible that it would cost more than $140,000 to relocate the sewer line. But even if Alexander's estimate is accurate, the cost of moving the Utility Lines is not material.

Assuming a total project cost of between $5,275,000 and $6,675,000, the expenditure of $176,995 to move the Utility Lines would represent between 3.4% and 2.7% of the total project cost. No reasonable trier of fact could find that the cost of moving the Utility Lines was so substantial as to defeat the object of the Buy-Sell Agreement.

As in *Woodahl, Halcro,* and *Turner,* any mutual mistake as to the existence and location of the Utility Lines was not so substantial as to defeat the object of the Buy-Sell Agreement. Because the undisputed evidence demonstrates that the alleged mistake was not material to the transaction, Kiesel's claim for rescission fails as a matter of law.

### F.    Punitive Damages (Count 6)

Kiesel's Amended Complaint also includes a claim for punitive damages. (Doc. 27 at ¶¶ 80-84) Under Montana law, compensatory damages are a prerequisite to punitive damages. Mont. Code Ann. § 27-1-220(1) (punitive damages may only be awarded "in addition to compensatory damages"); *Stipe v. First Interstate Bank-Polson*, 188 P.3d 1063, 1068 (Mont. 2008) ("Actual damages

46

are a predicate for punitive damages, and an individual with no real or actual damages has no right of action for punitive damages."). Because Kiesel's claims for compensatory damages all fail as a matter of law for the reasons discussed above, he cannot maintain a claim for punitive damages.

## V.      **Conclusion**

For the reasons discussed above,

IT IS ORDERED that Hyde's Motion for Summary Judgment (Doc. 59) is GRANTED, Kiesel's Motion for Partial Summary Judgment (Doc. 54) is DENIED, all other motions are DENIED AS MOOT, and this case is DISMISSED.

DATED this 30th day of August, 2024.

Kathleen L. DeSoto
United States Magistrate Judge